Willie S. **EDWARDS**, Rosalyn V. Edwards and John L. Dixon,
Plaintiffs,

v.

The **UNITED STATES**, Defendant.

No. 522–88C.

United States Claims Court.

March 6, 1990.

Howard P. Satisky, Raleigh, N.C., for plaintiffs.

Sandra C. McFeeley and Norman D. Menegat, Washington, D.C., for defendant.

## MEMORANDUM OPINION

LYDON, Senior Judge:

In this contract case, plaintiffs seek monetary and equitable relief arising out of a contract they had with defendant, acting through the United States Postal Service (Postal Service), to construct and lease to the government a post office facility at Nags Head, North Carolina. Plaintiffs' complaint sets forth three separate claims for relief. In count I, plaintiffs seek contract reformation and/or breach of contract damages. In count II, plaintiffs seek an equitable adjustment in the contract price due to unforeseen changes in local ordinances and zoning regulations. In count III, plaintiffs seek specific performance.

Defendant has moved for dismissal of plaintiffs' first claim on jurisdictional. grounds, and has moved for summary judgment on plaintiffs' first and second claims. Defendant did not address plaintiffs' third claim. Plaintiffs oppose defendant's motions, and, in turn cross move for summary judgment on their first claim for relief. Upon consideration of the submissions of the parties, and oral argument, the court concludes that defendant's motion for summary judgment should be granted on counts I and II, and plaintiffs' cross motion

for summary judgment on count I should be denied.

### Facts

In 1983 the Postal Service determined that it needed a new post office facility in the town of Nags Head, Dare County, North Carolina. Postal Service officials decided to implement the "open advertising" method of procuring a location for the facility, in which the bidders own or control the proposed site, as opposed to the "controlled site" method, in which the Postal Service controls the site. Due to the shortage of manpower at the time, Postal Service officials chose the open advertising method because it does not require Postal Service employees to investigate zoning and other requirements pertaining to a proposed site.

After the Postal Service designated the preferred site area for the Nags Head project, it assigned one of its senior real estate specialists, Wallace Nelms (Nelms) to the project. Nelms' task generally was to investigate, choose and recommend, if necessary, a specific site or sites within the "preferred relocation area" on which to locate the new post office. A "preferred area" is, according to Nelms, an area that will afford the Postal Service all the advantages it needs in delivering the mail and being available to the public.

After Nelms' assignment to the Nags Head project, he traveled from his Atlanta, Georgia office to Nags Head and contacted Lillie Wyonnia Doll Gray (Gray), Postmistress of Nags Head, whom he had known for at least five years, regarding his assigned duty. Nelms had nothing to do with the determination of the preferred area. His job was to identify sites within the preferred area that might be suitable and available for a postal facility. Gray informed Nelms that she and/or her family controlled a tract of land that was suitably zoned for the project. In this regard, Gray was acting in her personal capacity and as a representative of an estate which owned the land. The land controlled by Gray consisted of approximately 101,059 square feet, which fronted on the west side of the Highway 158 By–Pass. Although the land could not be sold at the time since it ostensibly was in probate proceedings, it could be leased. Nelms observed that the size of Gray's land was suitable for the new post office.

Nelms did not make any further investigation of Nags Head zoning requirements, but instead relied on Gray's representation that the land was properly zoned to allow for post office construction. Nelms stated in his deposition that in 1985 it was Postal Service policy to check only for proper zoning, i.e., that it was zoned for a postal facility, on a preferred site before making an award. He also stated that it was not Postal Service policy to check the title to the land. While Nelms did not do an intensive search of the preferred area, he became aware that there were a couple of other sites available therein.

On March 28, 1985, the Postal Service advertised bid specifications for the proposed Nags Head post office facility under the open advertising method. The bid specifications called for bidders to build within a designated preferred area, and to lease to the Postal Service, 3,676 square feet of enclosed building, 390 square feet of platform, 22,462 square feet of parking, driveway and maneuvering, 1,726 square feet of sidewalk, and 13,970 square feet of landscaping, for a total site area of approximately 42,500 square feet, with dimensions of approximately 170 feet × 250 feet.

Persons who requested bidding documents for the Nags Head project received a package containing, inter alia, an Agreement to Lease (lease agreement or contract), and a set of Series F standard plans with specifications printed on them. The lease agreement contained, inter alia, a "Permits and Responsibilities" clause, set forth verbatim in the discussion below, which required the contractor to comply with all applicable federal, state and local laws and regulations in performing the contract.

The Bid Invitation contained provisions warning the bidders of their responsibility for basing their bids on properly zoned property, and for obtaining proper zoning if necessary. The Bid Invitation also em-

phasized that the bidder must own or control the property, and that the successful bidder must furnish water in accordance with federal, state and local laws.

The Bid Invitation was issued on March 28, 1985, and required bids to be submitted by April 29, 1985. The "preferred area" was described as being bounded on the north by Sound Side Road, on the south by Highway 64, and on the east and west by the Highway 158 By–Pass.

At this time, Nelms was aware that plaintiffs Willie Edwards (Edwards) and John Dixon (Dixon) were interested in building postal facilities for lease to the Postal Service. Dixon had been a close personal friend of Nelms since 1971, and he was aware of Nelms' expertise as a Real Estate Specialist for the Postal Service. Indeed, Nelms had assisted plaintiffs on at least one prior post office project, which plaintiffs built in Nashville, North Carolina for lease to the Postal Service. Nelms informed plaintiffs and others that there was a site in the preferred area that would meet the Postal Service's specifications, in terms of size, zoning and location, and that it might be available for such purposes. According to the deposition of plaintiff Edwards, Nelms told him about the site and said "it was available to put the post office on." He could not recall Nelms telling him anything else about the matter.[1]

Although plaintiffs had already built one post office, they were not building contractors by occupation. Dixon was in the restaurant business, and resided in Wilson, North Carolina, and Edwards was a beverage broker, and resided with his wife Rosalyn, who is also a plaintiff, in Rocky Mount, North Carolina. None of the plaintiffs had ever lived in Nags Head, although Edwards owned property there and in other parts of Dare County before and during 1985.

Plaintiffs thereafter contacted Gray and negotiated a "ground lease" agreement for an annual rental of $10,000 for a period of fifteen years, with an option to purchase. Plaintiffs did not seek the assistance of an attorney during this real estate transaction. Neither Nelms nor any postal official acting in an official capacity participated in these negotiations. Plaintiffs at no relevant time checked out the title to the Gray property, or the zoning ordinance governing the property, nor did they talk to any appropriate Nags Head official about the property, its location or any local rules affecting the property. As to why they did not do so, Edwards replied in his deposition, "Wally said it was suitable for a post office and that was it. We just took Wally's [Nelms] word." [2]

On or about April 23, 1985, plaintiffs submitted their bid on the Nags Head post office project. The bid specified that the Postal Service would lease the land and building for a base term of fifteen years at an annual rent of $41,133.64, with three five-year renewal terms at the respective annual rents of $49,333.64, $54,266.64 and $59,692.00. Plaintiffs also signed the Agreement to Lease at the same time they submitted their bid.

As stated above, plaintiffs admit that they failed to check the title to Gray's land prior to submitting their bid. Furthermore, Edwards admits that neither he nor Dixon checked the zoning ordinance for Nags Head, and that he (Edwards) only glanced over the contract provisions before submitting the bid. Plaintiffs did not consult or contact Nags Head officials regarding their proposed bid. There is no indication in the materials at hand whether plaintiffs consulted or retained an attorney relative to the Nags Head project, until March 9, 1988, when plaintiffs' counsel, Mr. Satisky, sent a letter to the Postal Service's contracting officer, detailing plaintiffs'

---

1. In subsequent affidavits, dated October 17, 1989, both Edwards and Dixon stated that Nelms told them that "any property purchased in excess of the 42,500 square foot recommended site could be used by the purchasers for future development." However, these statements conflict with statements in their earlier depositions that they never discussed their development plans with Nelms or anyone else.

2. Plaintiffs admitted at oral argument that, had they been dealing with any Postal Service employee other than Nelms, they would have checked the zoning and title of the Gray tract.

claims against the Postal Service on the contract at issue here.

Plaintiffs intended to use the remainder of the 101,059 square feet of Gray's land for additional development, since they believed that the post office would require only about 42,500 square feet, and their bid was based on this intention. However, this intention was never conveyed to Nelms or any Postal Service official prior to the submission of their bid. Both Edwards and Dixon stated that Nelms did not say anything to them regarding the possible use of that portion of Gray's land that would not be occupied by the post office, and although these statements conflict with their 1989 affidavits, their depositions make it clear that the only use of the land discussed with Nelms was use as a postal facility.

The Postal Service received four bids on the Nags Head project.[3] Since plaintiffs' bid was the lowest, the Postal Service accepted it on July 29, 1985.

In February and March of 1985, the Nags Head Board of Commissioners (Board), which was the zoning and legislative body of the town, held three meetings at which the Board discussed the need to ensure an adequate water supply for the town. After several drafts of a water allocation ordinance for new development were presented at meetings from April through August 1985, the Board adopted the new ordinance at the August 5, 1985 meeting, which required a project such as the post office to make additional upgrades to ensure an adequate water allocation.

The Nags Head zoning ordinance in effect in 1985 required that no more than thirty percent of a building lot in an R–2 zoning category could be covered with impermeable surface, unless fifteen percent of the surfacing is open face paving block, which would permit a maximum of forty-five percent of the lot to be covered with impermeable surface. In 1985 the land plaintiffs leased from Gray was zoned R–2 (medium density residential district), but permitted some commercial uses, including a post office. However, since the post office and parking areas were impermeable surfaces, the project required not 42,500 square feet, but rather 92,333 square feet to comply with the R–2 zoning ordinance. It is not unreasonable to conclude that a check of the zoning ordinance prior to April 23, 1985 would have revealed this fact. The Nags Head zoning ordinance was available for public access in the Nags Head town records at all relevant times in 1985.

The Nags Head zoning ordinance also contained in 1985 a provision requiring at least 600 feet between curb cuts on one street. The F Series standard plans provided by the Postal Service called for two curb cuts less than 600 feet apart, in violation of this provision.

The town's new water allocation ordinance implemented an approval process for commercial projects once every six months. In order to get approval for the post office project, plaintiffs had to provide an additional access road to the site, pave an additional fire access, and double all yard and parking area setbacks.

In the latter part of 1985, the town adopted new regulations which required, inter alia, a planted buffer around the perimeter of the post office site. As a condition to site plan approval, the town also required plaintiffs to install 880 feet of water line under the Highway 158 By–Pass to the post office site.

In June 1986, plaintiffs made a claim to the contracting officer for the Postal Service, Hugh Hicks (Hicks), for relief and equitable adjustment of the contract on the basis of site misrepresentations, specifications misrepresentations, and unforeseen legislative changes by the town after acceptance of the bid. Hicks met with plain-

---

**3.** Nelms stated in his deposition that one of the bids was withdrawn after the bidder, Mr. Chilton, discovered that plaintiffs had secured an exclusive option on Gray's tract, which was also the tract upon which Chilton's bid was based. Nelms also stated that another bid, from Mr. Saieed, was based on a site south of the Gray tract, on the highway. Obviously, the Gray tract was not the only available location upon which a bid could be based within the "preferred site area."

tiffs on or about June 12, 1986. Plaintiffs allege that Hicks proposed a new agreement, the essence of which provided for the Postal Service to lease the entire 101,059 square feet of plaintiffs' land for a rent increase of over $13,000 per year. Plaintiffs' allegations are supported by a memorandum written by Hicks dated June 20, 1986.[4]

The alleged agreement was not approved by Hicks' superiors. In a letter dated October 29, 1986, Hicks advised plaintiffs that the Postal Service's legal staff had determined that the difficulties with the town of Nags Head are plaintiffs' responsibility under the contract, for the following reasons. In its letter, the Postal Service stated it could not justify paying $39,000 per year for 800 additional square feet of land. The Postal Service also noted in its letter that there could be no oral amendment to change a written contract, especially a "cardinal change" such as the size of the building, which would require the Postal Service to readvertise for a larger building. The letter concluded by stating that if plaintiffs did not proceed with construction pursuant to the Agreement to Lease, they would be terminated for default.

Under protest, plaintiffs completed the post office construction pursuant to the original bid specifications. Plaintiffs made two unsuccessful attempts to obtain reimbursement for additional expenses from the contracting officer in 1987 and 1988, the latter attempt through their attorney.

Plaintiffs filed their complaint, subsequently amended, in this court on September 6, 1988. Plaintiffs' complaint sets forth three claims for relief on the grounds of misrepresentation, unforeseen changes in local ordinances and zoning regulations, and specific performance, respectively.

■ Defendant seeks dismissal of plaintiffs' misrepresentation claim on jurisdictional grounds. Defendant also seeks summary judgment on the misrepresentation claim, and on the claim of unforeseen changes in local ordinances and zoning regulations. Defendant's motion does not address plaintiffs' third claim for specific performance of the alleged June 12, 1986 settlement agreement.[5]

Plaintiffs contend in their cross motion for partial summary judgment that, as to their misrepresentation claim, there are no genuine issues of material fact, and plaintiffs are entitled to summary judgment as a matter of law.

*Discussion*
–I–

A. Tort or Contract Claim

Defendant has moved for dismissal of count I of plaintiffs' complaint for lack of subject matter jurisdiction. In count I, plaintiffs allege that defendant's agent Nelms made false representations concerning the suitability of the so-called "Doll" Gray tract for the construction of a post

---

4. There exist several questions of fact regarding the settlement agreement. For example, did Hicks have the authority to enter into a binding agreement on behalf of the Postal Service, and, if so, did Hicks actually enter into such an agreement, or did he merely make a recommendation to his supervisors that they do so? Hicks was the contracting officer on this project until October 1986, when he was succeeded by Frank Womack.

 The facts as alleged by plaintiffs suggest that there may be an issue as to whether the alleged settlement agreement amounted to an accord and satisfaction. *See, e.g., Cannon Constr. Co. v. United States,* 162 Ct.Cl. 94, 105, 319 F.2d 173, 176–77 (1963) (contracting officer has authority to enter into compromise settlements binding both parties); *Construction Serv. Co. v. United States,* 174 Ct.Cl. 756, 763–65, 357 F.2d 973, 976 (1966). However, since neither party seeks

summary judgment on the settlement agreement issue (third claim for relief) the question of Hicks' authority is best left for subsequent disposition.

5. Like its predecessor the Court of Claims, the Claims Court has no jurisdiction over equitable matters such as specific performance. *See United States v. King,* 395 U.S. 1, 3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969) (Tucker Act does not give Court of Claims jurisdiction over equitable matters); *Glidden Co. v. Zdanok,* 370 U.S. 530, 557, 82 S.Ct. 1459, 1476, 8 L.Ed.2d 671 (1962); *Cleveland v. United States,* 9 Cl.Ct. 741, 746 (1986) ("the Tucker Act has never been held to be a valid jurisdictional source for this court to base the award of a general equitable remedy such as specific performance."); *Jesko v. United States,* 3 Cl.Ct. 730, 732 (1983), *aff'd,* 790 F.2d 94 (Fed.Cir.1986).

office, upon which plaintiffs reasonably relied, and these misrepresentations constitute a mutual mistake entitling plaintiffs to reformation of the contract. Defendant contends that plaintiffs' allegations of misrepresentation sound in tort, and therefore fall outside the provisions of the Tucker Act under which plaintiffs assert jurisdiction. Furthermore, defendant contends that plaintiffs' misrepresentation claim is barred by the misrepresentation exclusion of the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(h), and thus precludes transfer of this case to the district court under 28 U.S.C. § 1506 (1982), since to do so would not be in the "interests of justice." [6]

█ The Tucker Act, 28 U.S.C. § 1491, expressly excludes tort claims from Claims Court jurisdiction. *See Hartle v. United States,* 18 Cl.Ct. 479, 483 (1989); *Garrett v. United States,* 15 Cl.Ct. 204, 208–09 (1988); *DeBarros v. United States,* 5 Cl.Ct. 391, 394 (1984). While the Claims Court held in *DeBarros* that claims alleging governmental misrepresentation of material fact are barred on jurisdictional grounds, that holding must be confined to the facts in that case. Where the facts are different, a different result may well ensue. In *Florida Keys Aqueduct Authority v. United States,* 231 Ct.Cl. 911, 912 (1982), the Court of Claims held that, where privity of contract exists between the parties, there is a contract aspect to a claim for misrepresentation at the pre-award stage, and subject matter jurisdiction exists. *See also Fountain v. United States,* 192 Ct.Cl. 495, 427 F.2d 759 (1970), *cert. denied,* 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971); *Jeppesen Sanderson, Inc. v. United States,* 19 Cl.Ct. 233, 236–37 (1990) (to be reported at 19 Cl.Ct. 233); *Hartle, supra,* 18 Cl.Ct. at 483; *Gregory Lumber Co. v. United States,* 9 Cl.Ct. 503, 525–26 (1986), *aff'd,* 831 F.2d 305 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988); 2 J. McBride & I. Wachtel,

*Government Contracts* § 13.30, at 13–22 (1989) (the term "misrepresentation" in the FTCA includes tortious intent, but is defined as an "erroneous statement of fact without tortious intent" in a contract context).

The facts alleged in this case do not indicate a tortious intent to misrepresent or deceive on the government's part. In addition, since privity of contract exists between the parties, and the misrepresentation claim is so inextricably connected to the contract at issue, the court finds that it has jurisdiction under the Tucker Act and is not barred from hearing and deciding plaintiffs' misrepresentation claim. *See Hartle, supra.* Therefore, defendant's motion to dismiss count I of plaintiffs' complaint for lack of subject matter jurisdiction is denied.

### B. Misrepresentation

Since the court finds that it has jurisdiction over plaintiffs' misrepresentation claim, the court must next consider the parties' cross-motions for summary judgment on this claim. Defendant contends that, to the extent plaintiffs' misrepresentation claim is not barred on jurisdictional grounds, defendant is entitled to summary judgment on this claim, since there are no factual disputes regarding the issue of reformation based on mutual mistake as to the amount of land required for the post office. Rather, defendant contends that the undisputed facts support a finding of unilateral mistake, a mistake of law, or a mistake in business judgment on plaintiffs' part, none of which entitles plaintiffs to reformation or compensation.

Plaintiffs oppose defendant's motion for summary judgment, and have filed a cross-motion for summary judgment on their misrepresentation claim, contending that the misrepresentation amounts to a mutual mistake of fact or law, entitling plaintiffs to reformation of the contract. Plaintiffs

---

6. *See Dancy v. United States,* 229 Ct.Cl. 300, 308, 668 F.2d 1224, 1227–28 (1982); *Little River Lumber Co. v. United States,* 7 Cl.Ct. 492, 494 (1985). "A case should not be transferred or retransferred to a District Court if it most probably would be a futile act.... If the District Court most probably would lack or find a lack of jurisdiction over the case then the case should not be transferred or retransferred since it would not serve the interests of justice." *Little River Lumber, supra,* 7 Cl.Ct. at 494 (citing *Dancy, supra* ).

also assert there are no material issues of fact relative to this claim.

 In order for plaintiffs to survive a motion for summary judgment against them on their misrepresentation claim, they must allege facts sufficient to support a finding on all five of the following elements: [1] that the government's representation was erroneous; [2] that the representation was material; [3] that it operated as an inducement to entering into the contract; [4] that plaintiffs had a legal right to rely on the accuracy of the representation; and [5] that plaintiffs did in fact rely on the representation to their injury. *See* 2 J. McBride & I. Wachtel, *supra*, § 13.30, at 13–22 (1989); *Summit Timber Co. v. United States*, 230 Ct.Cl. 434, 445–46, 677 F.2d 852, 857 (1982).

Defendant argues that plaintiffs had no legal right to rely on Nelms' alleged misrepresentations. First, defendant contends that the "Permits and Responsibilities" clause in the lease agreement obligates plaintiffs to comply with all applicable federal, state and local laws and regulations. The clause states, in pertinent part: "The Lessor shall, without additional expense to the Postal Service, be responsible for obtaining any necessary licenses and permits required for privately owned buildings, and for complying with any applicable Federal, State, and municipal laws, codes, and regulations, in connection with the performance of the work." Thus, defendant argues, any matters relating to zoning and construction of the facility were the obligation and responsibility of plaintiffs.

Second, defendant contends that plaintiffs' failure to inform themselves about the applicable zoning ordinance and legislative changes constitutes a subjective error in judgment, not a mistake of law or fact, and defendant should not be held liable for such error. In effect, defendant argues that plaintiffs had no legal right to rely on the accuracy of the government's representations, and therefore plaintiffs have failed to satisfy the fourth element of the misrepresentation test set out above.

In support of their motion for summary judgment on the misrepresentation claim,

plaintiffs contend that they are legally entitled to rely on the government's representations concerning the suitability of the Gray tract for a post office facility. At oral argument, plaintiffs alleged that Nelms represented to plaintiffs that only 42,500 square feet would be needed to accommodate the post office. In addition, plaintiffs argued that the bidding documents were misleading in that plaintiffs were led to believe that the Postal Service was looking for a piece of land with dimensions of 42,500 square feet.

 It is true that the Postal Service's bidding documents and accompanying news release state that the building site should contain 42,500 square feet of land. The court interprets these documents, however, as a request for bids on any site capable of accommodating a 42,500 square foot building site, which includes the dimensions of the building, the parking lot and other amenities. Contract interpretation is a question of law, including the interpretation of ambiguous contract provisions. *See Industrial Indem. Co. v. United States*, 14 Cl.Ct. 351, 356 (1988); *John C. Grimberg Co., Inc. v. United States*, 7 Cl.Ct. 452, 456 (1985), *aff'd*, 785 F.2d 325 (Fed.Cir.1985); *Ceccanti, Inc. v. United States*, 6 Cl.Ct. 526, 528 (1984). The totality of the bidding documents and news release, reasonably read, do not indicate that the site on which the postal facility was to rest was to consist of only 42,500 square feet.

 Plaintiffs advance an additional argument in support of their misrepresentation claim by contending that the Postal Service did not follow the open advertising method in procuring a site for the new postal facility, but rather followed a procedure more closely resembling the controlled site method. By this argument, plaintiffs seek to shift their burden of investigating and obtaining proper zoning of the building site to defendant. However, plaintiffs ignore the clear language on the face of the Postal Service's Advertisement for Bids, which reads "Open Advertising for New Leased Construction," and the Postal Service's News Release regarding the proposed Nags Head project, which

states that "[u]nder the Postal Service 'open advertising' program for leased facilities, prospective bidders are asked to offer site and construction bids or building and maneuver area as a single package." Moreover, plaintiffs ignore the fact that the Postal Service did not own or control the site upon which plaintiffs based their bid, which is the critical distinguishing feature of the open advertising method. The open advertising program places on bidders the duty, inter alia, of ascertaining local zoning requirements.[7]

The Agreement to Lease entered into between plaintiffs and the Postal Service contains the above-quoted "Permits and Responsibilities" clause, which is not ambiguous on its face. It seems clear that the Nags Head zoning ordinance falls within the purview of "municipal laws, codes and regulations." Furthermore, before submitting their bid and entering into the lease agreement, plaintiffs were given a copy of the Bid Invitation, which contains an express warning that the successful bidder "shall be responsible for all action necessary to obtain proper zoning." These provisions indicate that plaintiffs had notice of their obligation to investigate and comply with Nags Head zoning regulations. The Nags Head zoning ordinance was accessible to the public by consulting Nags Head town records, thus both parties had equal access to this information. This is not a case of "superior knowledge" where the government withheld information within its exclusive control to the detriment of the contractor. Therefore, the burden was on plaintiffs to check the town's zoning regulations, and they must suffer the consequences of their failure to do so. They had no legal right to rely on the vague representations of the government's real estate officer Nelms that the Doll Gray tract was "suitable" for the post office without making any further investigation.[8] Plaintiffs admit that they did not even check the title to the Gray tract, let alone the zoning ordinance. Plaintiffs' contention that the Postal Service should have done so must fail, since under the open advertising program, the Postal Service had no duty to investigate sites upon which bidders' bids were based.

In a similar case, a contractor sought reformation of a post office construction contract, based on alleged misrepresentations by the Postal Service regarding the applicability of state and local sales tax laws, upon which the contractor alleged it was entitled to rely. See Sanders–Midwest, Inc. v. United States, 15 Cl.Ct. 345 (1988). The court reasoned that, since the contract required the contractor to ascertain the local conditions affecting the cost of the work, and since the contractor had

7. Literally, the admitted language of Nelms, which plaintiffs brand as misrepresentations, is not untrue. According to the depositions of plaintiffs and Nelms, Nelms never stated that only 42,500 square feet would be needed to construct the post office on the Gray tract. Nelms' only affirmative statements regarding the "Doll Gray tract," which is the way the land in question was described, were that it was (1) "suitable," i.e., it was in a zone (R–2) on which a postal facility could be constructed albeit certain zoning restrictions applied, all of which were readily ascertainable by anyone, and (2) "available," a fact confirmed by the option plaintiffs obtained from those who controlled the Doll Gray tract. Any finding of misrepresentations in these utterances requires intuitive plumbing of the highest order. Even accepting plaintiffs' belatedly raised version of what Nelms said, i.e., that only 42,500 square feet were needed for the postal facility and the additional land was available to plaintiffs for other purposes, the critical fact is that the bid documents and the contract that followed placed the burden, and risk, on plaintiffs relative to obtaining and controlling a properly zoned site for a 42,500 square foot postal facility. Plaintiffs, at oral argument, conceded that had they checked the zoning requirements prior to bidding they would have discovered that placing the postal facility on the site at issue required some 99,000 square feet and not 42,500 square feet. Failure to check the local zoning requirements was a responsibility placed on plaintiffs by the bid documents. They cannot evade this responsibility by seeking to raise and rely on a strained reading of the contract documents and news release or by recourse to generalized language uttered by Nelms.

8. Even if the court were to conclude that Nelms misrepresented the Doll Gray tract to plaintiffs, which it is not inclined to do, the Postal Service is not bound by the unauthorized oral representations made by its agents before the contract is awarded. See Ceccanti, Inc. v. United States, 6 Cl.Ct. 526, 530 (1984).

an equal opportunity to ascertain the applicability of state and local tax laws to the work performed under the contract, any failure to do so would not entitle the contractor to additional compensation. *Sanders–Midwest, supra,* 15 Cl.Ct. at 350. In its analysis, the court cited *Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), for the proposition that "[p]ersons are charged with knowledge of the law." *Sanders–Midwest, supra,* 15 Cl.Ct. at 350. *See also LaFont v. United States,* 17 Cl.Ct. 837, 844 n. 9 (1989). Moreover, the court found that, even if the Postal Service had misrepresented the law, the contractor would not be entitled to compensation. *Sanders–Midwest, supra,* 15 Cl.Ct. at 350 (citing *Mills v. United States,* 187 Ct.Cl. 696, 410 F.2d 1255 (1969); *Airmotive Eng'g Corp. v. United States,* 210 Ct.Cl. 7, 13 n. 3, 535 F.2d 8, 11 (1976)).

The *Mills* case, *supra,* is particularly appropriate in the context of the case at bar. Plaintiffs in this case were dealing with real estate. They were charged with the responsibility of purchasing or controlling the land on which the postal facility was to be built. Under the circumstances, one would assume that reasonable and prudent business people would operate through a lawyer to assist them in those matters relative to zoning laws, title, and other related municipal matters. There is no allegation, nor hint, in the materials before the court, that plaintiffs utilized or relied on an attorney in matters that cried out for legal assistance.[9]

In somewhat analogous circumstances in *Mills,* the Court of Claims observed: "Ordinarily one having need of legal advice will retain counsel and not take it from the other side of the negotiating table. Purchase and sale of real estate is a kind of transaction where retention of counsel is ordinary and usual. The relationship of the parties was such that it was not reasonable for one side to have relied on the representation of the other." *Mills, supra,* 187 Ct.Cl. at 700, 410 F.2d at 1258. The Court of Claims in *Mills* directed this language at a widow, age 80, with little formal education (187 Ct.Cl. at 698, 410 F.2d at 1257). In the case at bar, plaintiffs are experienced businessmen who engaged in a number of real estate activities. They were not "babes in the woods." *See Byrne Org., Inc. v. United States,* 152 Ct.Cl. 578, 587, 287 F.2d 582, 587 (1961).

The court in *Sanders–Midwest* was careful to distinguish from its facts the situation in which the government has a duty to disclose superior knowledge. *Sanders–Midwest, supra,* 15 Cl.Ct. at 350 n. 4 (citing *Petrochem Servs., Inc. v. United States,* 837 F.2d 1076 (Fed.Cir.1988)). Like *Sanders–Midwest,* this is not a case in which the government had a duty to disclose superior knowledge. Plaintiffs and the Postal Service were equally able to conduct a thorough investigation of the applicable municipal laws and regulations. Neither party did so, although the Postal Service did ascertain that the preferred site area was zoned to allow the construction of a post office. The burden was on plaintiffs, however, to make the investigation. They were put on notice of this obligation by the terms of the Bid Invitation and the Agreement to Lease. Although plaintiffs cite cases supporting their view that they are entitled to rely on the government's representations, plaintiffs fail to note that these cases turn on the fact that the government possessed superior knowledge to which the contractor did not have equal access.[10]

---

9. At oral argument, plaintiffs admitted that if they had been dealing with any Postal Service employee other than Nelms, they would have investigated the zoning and other information pertinent to the Gray tract. However, federal courts have held that even elderly widows and farmers are not entitled to rely on the representations of unauthorized government personnel. *See Federal Crop Insurance, supra,* 332 U.S. at 383–85, 68 S.Ct. at 2–4; *Mills, supra,* 187 Ct.Cl. at 698, 410 F.2d at 1257.

10. Plaintiffs cite *Hollerbach v. United States,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *United States v. Stage Co.,* 199 U.S. 414, 26 S.Ct. 69, 50 L.Ed. 251 (1905); and *Summit Timber, supra,* 230 Ct.Cl. 434, 677 F.2d 852. In *Summit Timber,* the Court of Claims stated that such factors as a contractor's "failure to investigate 'sources which would have revealed the truth' " will absolve the government of liability for " 'misstatements of fact (in a contract or specifications) which are representations made to a

Therefore, the court finds that since plaintiffs in this case had the responsibility and the opportunity to investigate the Nags Head zoning ordinance, and had ample notice of their duty to do so, their failure to investigate is a burden they must bear. Under the circumstances, plaintiffs had no right to assume that the post office could be built on 42,500 square feet, without first investigating the zoning laws. An investigation of the applicable Nags Head zoning ordinance would not have been burdensome, expensive or time-consuming. Reliance by plaintiffs on Nelms' cryptic "suitable", or other generalized language, as embracing all local zoning requirements was unreasonable, and not in accord with normal business and professional standards.

As indicated previously, plaintiffs were not novices in the field of government contract negotiations. They had already successfully constructed and leased to the Postal Service one post office facility in Nashville, North Carolina. In fact, plaintiff Edwards stated in his deposition that one of the reasons plaintiffs did not investigate the Doll Gray tract and instead relied so heavily on Nelms to do "everything that was supposed to have been done" was because of the "easy time" they had with the Nashville project. However, in *Mills, supra,* the Court of Claims held, as noted above, that even an elderly uneducated widow was not entitled to rely on the government's representations of the law pertaining to her contract with the government. *Accord, C & L Constr. Co. v. United States,* 6 Cl.Ct. 791, 799 (1984), *aff'd,* 790 F.2d 93 (Fed.Cir.1986). Therefore, plaintiffs, as experienced contractors for at least one prior post office project, are certainly not entitled to rely on any representations the Postal Service may have made regarding the square footage required for this post office project.[11]

Since the court finds as a matter of law that plaintiffs are not legally entitled to rely on the government's representations, plaintiffs have failed to establish at least one of the five elements necessary to sustain a misrepresentation claim. The bidding documents clearly put the risks of zoning on plaintiffs. Under the open advertising procedure which the Postal Service implemented here, plaintiffs were obligated to obtain the land on which the postal facility was to be built. This obligation carried with it the duty to obtain land zoned to carry such a facility. Had plaintiffs touched base with the Nags Head officials before bidding they would have discovered the very fact they now complain about. They cannot so easily shift their obligation and duty to defendant under the bidding documents and existing circumstances.

The court must next consider plaintiffs' legal theory of mutual mistake of fact or law, which is also contained in count I of their complaint. Plaintiffs characterize the mutual mistake as a factual error concerning the size of the site that would be required to accommodate the post office facility, and concerning the suitability of Highway 158 for the two planned curb cuts. Plaintiffs allege that these mutual mistakes involve mistaken beliefs as to their existing legal rights. Plaintiffs contend that since these mistakes involve existing legal rights, they are mistakes of fact, and thus they are entitled to reformation of the contract. Even if the mutual mistake is characterized as one of law, plaintiffs contend that they are still entitled to reformation.

contractor.'" *Summit Timber, supra,* 230 Ct.Cl. at 441, 677 F.2d at 857 (quoting *Flippin Materials Co. v. United States,* 160 Ct.Cl. 357, 365, 312 F.2d 408, 413 (1963)).

**11.** The Claims Court has made it clear that "the government's liability for failure to provide information arises from a conscious omission to share superior knowledge it possesses in circumstances where it permits a contractor to pursue a course of action known to be defective. *The government is under no duty to volunteer information that is reasonably accessible from another source." Max Jordan Bauunternehmung v. United States,* 10 Cl.Ct. 672, 679 (1986) (emphasis added), *aff'd,* 820 F.2d 1208 (Fed.Cir. 1987). *See also LDG Timber Enters., Inc. v. United States,* 8 Cl.Ct. 445, 451 (1985) (government has no duty to volunteer information where contract itself contemplates the means by which such information may be obtained, such as site inspection).

The courts have in the past allowed reformation of a contract based on mutual mistake of fact. *See Bowen–McLaughlin–York Co. v. United States*, 813 F.2d 1221, 1222 (Fed.Cir.1987); *American Employers Ins. Co. v. United States*, 812 F.2d 700 (Fed.Cir.1987); *Southwest Welding & Mfg. Co. v. United States*, 179 Ct.Cl. 39, 52–53, 373 F.2d 982, 989–91 (1967); *National Presto Indus., Inc. v. United States*, 167 Ct.Cl. 749, 338 F.2d 99 (1964), *cert. denied*, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965).

■ However, in *National Presto, supra*, the Court of Claims noted that courts generally "have been wary in granting relief from innocent mutual mistakes imbedded in, or underlying, consummated contracts." *National Presto, supra*, 167 Ct.Cl. at 761, 338 F.2d at 106–07. The Court of Claims then proceeded to set forth the two essential, if not necessarily sufficient, factors required for reformation of a contract based on mutual mistake of fact. First, the contract must not put the risk of mistake on the party seeking reformation. Second, it must be found that the party against whom reformation is sought would have agreed to the reformation now sought had it known the correct facts at the outset. *National Presto, supra*, 167 Ct.Cl. at 764, 338 F.2d at 108. Later cases have held that plaintiffs must meet the second part of this test by presenting clear and convincing evidence that defendant would have agreed to the contract as reformed.

*See Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed.Cir.1990); *Fraass Surgical Mfg. Co. v. United States*, 215 Ct.Cl. 820, 825, 571 F.2d 34, 37 (1978); *Gould, Inc. v. United States*, 19 Cl.Ct. 257, 263–64 (1990) (to be reported at 19 Cl.Ct. 257); *Jeppesen Sanderson, Inc. v. United States*, 14 Cl.Ct. 624, 628 (1988), *vacated on other grounds*, 868 F.2d 1277 (Fed.Cir.1989). Plaintiffs in this case appear to be unable to surmount either of these obstacles.

■ Plaintiffs' mistaken belief regarding the amount of square footage necessary to construct the post office on the Gray tract under the applicable zoning ordinance is a risk imposed on them by the terms of the Agreement to Lease, as stated above. Plaintiffs seemed to concede at oral argument that they bore the risk of zoning under the contract. Moreover, it is highly unlikely that the Postal Service would have agreed to pay for leasing more than double the square footage required by the Gray tract's R–2 zoning when the post office could have been constructed on less square footage on a less stringently zoned site within the preferred area.[12] Thus, plaintiffs' mutual mistake of fact claim is not legally viable.

Likewise, "relief for mutual mistake of law is rare." *C & L Construction, supra*, 6 Cl.Ct. at 798. The legal basis for this rule is that " 'both parties are generally held to have knowledge of the laws and regulations affecting their business deal-

---

**12.** Indeed, the Postal Service rejected all of plaintiffs' offers to lease additional land or build a larger building, as indicated in Hicks' October 29, 1986 letter to plaintiffs. Furthermore, it is apparent from the record that the preferred site area contained not only land zoned R–2, as was the Doll Gray tract, but also land zoned R–1 (low density residential district), CR (commercial-residential district), C–1 (neighborhood commercial district), and C–2 (general commercial district).

In contrast to the Doll Gray tract's R–2 zoning, which allows a maximum of 30% of impermeable surface coverage (45% if open face paving block is used), the CR zoning district allows a maximum of 55% of impermeable surface coverage (65% if open face paving block is used). The C–1 and C–2 districts allow up to 65% of impermeable surface coverage (75% if open face paving block is used).

The record indicates that other owners of land expressed interest in building the post office facility on land they owned and controlled and thereafter lease it back to the government. Although the materials before the court indicate that the Postal Service was unaware that plaintiffs' site was zoned R–2 when the contract was made, the materials also indicate the Postal Service most probably would not have agreed to reformation had it known the zoning facts at the outset. This conclusion is not altered by evidence of an alleged settlement agreement between plaintiffs and the contracting officer. Such evidence fails to meet the clear and convincing standard of proof discussed above, and, at best reflects the parties attempt at an equitable resolution of the dispute. The law, however, places the risks of zoning on plaintiffs.

ings.' " *Id.* at 798 (quoting C. Hagberg, *Mistake in Bid, Including New Procedures Under Contract Disputes Act of 1978*, 13 PUB.CONT.L.J. 257, 299 (1983)). *See also Federal Crop Insurance, supra*, 332 U.S. at 384–85, 68 S.Ct. at 3–4.

In *C & L Construction*, the court concluded that, since plaintiff was charged with knowledge of the applicable federal statutes, plaintiff could not properly rely on its ignorance of these statutes in asserting mutual mistake of fact or law as a basis for reformation. On this basis the court rejected plaintiff's request for reformation of the contract.

Therefore, the court concludes that, regardless of whether plaintiffs characterize the parties' alleged mutual mistake as one of fact or law, plaintiffs had the burden to comply with all applicable laws and regulations. As a result, there can be no mutual mistake regarding the zoning ordinance, or legislative changes made by the town of Nags Head involving, inter alia, water allocation, street paving, or the minimum distance between curb cuts on one street. The court concludes as a matter of law that plaintiffs are not entitled to reformation of the contract based on claims of mutual mistake of law or fact.

In addition, plaintiffs advance an argument for reformation of the contract based on unilateral mistake of law or fact. Plaintiffs contend that the Postal Service should have known that plaintiffs made a mistake in bidding on the recommended site of 42,-500 square feet. The rule regarding the equitable remedy of reformation for a unilateral mistake in a contractor's bid is that it is only available if " 'the government knew or should have known of a mistake in a bid costly to the bidder.' " *C & L Construction, supra*, 6 Cl.Ct. at 800 (quoting *Burnett Elecs. Lab, Inc. v. United States*, 202 Ct.Cl. 463, 472, 479 F.2d 1329, 1333 (1973)). *Accord, Carrier Corp. v. United States*, 6 Cl.Ct. 169, 173 (1984). Furthermore, the Claims Court has stated that the policy behind such a rule is to prevent " 'the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed ... that the

bid is based on or embodies a disastrous mistake, and accepts the bid in face of that knowledge.' " *C & L Construction, supra*, 6 Cl.Ct. at 108 (quoting *Ruggiero v. United States*, 190 Ct.Cl. 327, 335, 420 F.2d 709, 713 (1970)). *Ruggiero* also made clear that such mistakes must be arithmetic or clerical, or involve the misreading of specifications, and not mistakes in judgment. *See also Ralden Partnership v. United States*, 891 F.2d 1575, 1578 (Fed.Cir.1989) (no reformation for mistake in judgment as to future applicability of federal law); *United States v. Hamilton Enters., Inc.*, 711 F.2d 1038, 1046, 1048 (Fed.Cir.1983) (an erroneous bid based on a mistake in judgment does not entitle contractor to reformation); *Sanders–Midwest, supra*, 15 Cl.Ct. at 350 (no reformation when contractor had equal opportunity to ascertain nature of state and local law); *Jeppesen Sanderson, supra*, 14 Cl.Ct. at 628 (no reformation for mistake in judgment as to occurrence of future events).

In this case, the evidence presented suggests that the government's real estate officer, Nelms, never discussed with plaintiffs the possibility of developing that portion of the Gray tract that would not be used in the post office project. The evidence also suggests that plaintiffs never discussed with Nelms or any other postal official their interest to utilize the area of the Doll Gray tract in excess of 42,500 square feet for other purposes. Plaintiffs fail to allege any facts indicating that they ever discussed their plans to develop the remainder of the tract with any government agent other than perhaps Nelms. Therefore, there is no basis for plaintiffs' assertion that the government should have known that plaintiffs were basing their bid on the assumption that the post office project would require only 42,500 square feet of land. There are no clerical or arithmetic errors involved here, no overreaching by a contracting officer, nor any misreading of the bid specifications. Rather, plaintiffs erred in their decision to rely on the representation of Nelms that the Gray tract was "suitable" for a post office without making any investigation themselves regarding the zoning laws applicable to the

site. Since the lease agreement placed the burden to investigate all zoning laws and regulations on plaintiffs, their error in failing to do so is a mistake in business judgment which does not entitle them to reformation of the contract.

Plaintiffs' final two claims contained in count I of their complaint are that the Postal Service breached the implied warranty that its government specifications are adequate,[13] and that the Postal Service breached its duty to act in good faith regarding the fitness of the Gray tract for the construction of the post office. The latter claim is for the most part merely a reiteration of plaintiffs' misrepresentation claim, which has been thoroughly analyzed above. No purpose would be served by restating the legal analysis that led the court to conclude that plaintiffs are not entitled to rely on the Postal Service's representations regarding the Gray tract.

■ With regard to plaintiffs' defective specifications claim, the Postal Service admits in its brief, for the purposes of its summary judgment motion, that the bid specifications were of the design type, as opposed to the performance type.[14] That is, by following the prescribed drawings and instructions, the contractor would be able to produce the building sought by the Postal Service. Assuming, therefore, that the Postal Service's bid specifications were of the design type, it cannot be said they were defective—they accurately reflected the amount of square footage that would be occupied by the postal facility. The preferred area contained commercially-zoned land as well as residentially-zoned

land. Plaintiffs chose to submit their bid based on a residentially-zoned tract, and under the open advertising program followed by the Postal Service for this project, plaintiffs were required to investigate the zoning requirements for the Gray tract, over which they obtained control by lease,[15] and upon which their bid was based.

The bid specifications did call for two curb cuts within 600 feet of each other, which conflicted with the provisions of the Nags Head zoning ordinance, but again, the burden was on plaintiffs to ascertain the nature of local laws and regulations before submitting their bid. Had plaintiffs consulted the Nags Head zoning ordinance provisions, they would have been put on notice of the 600 foot curb cut requirement contained therein.

–II–

In count II of their complaint, plaintiffs allege that, due to changes in the local ordinances and zoning regulations of Nags Head that could not have been foreseen by a prudent bidder, plaintiffs are entitled to an equitable adjustment in the amount of $28,718 for the construction and paving of Deering Street, $14,000 for installing a water line, and $5,445 for additional buffer landscaping work, for a total cash claim of $48,163. Defendant seeks summary judgment on this claim based on the contention that the risk of changes in local laws and regulations, whether or not foreseen, falls on the contractor.

■ Plaintiffs apparently contend that all three elements upon which they seek

---

**13.** *See supra* note 10. Plaintiffs' failure to investigate "sources which would have revealed the truth," i.e., the zoning ordinance, absolves the Postal Service of liability for any alleged misstatement of fact that may be found in its specifications. *Summit Timber, supra,* 230 Ct.Cl. at 441, 677 F.2d at 857.

**14.** It is well settled that "strict observance of the government's design specifications triggers the government's implicit warranty that satisfactory performance will result if the specifications are followed to the letter." *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 49 (1985) (citing *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 63 L.Ed. 166 (1918)).

**15.** There is conflict in the material before the court as to whether plaintiffs obtained an exclusive option to purchase or lease from Doll Gray before the bidding process was completed, thereby depriving other interested bidders of "available" land on which to base a bid to the Postal Service for construction and lease of the new postal facility. *See supra* note 3. If plaintiffs did get an exclusive option to lease and buy before the bidding process was completed it may well have served to limit the number of interested bidders.

recovery, *i.e.*, the street improvements, the water line, and the buffer landscaping, were unforeseeable. However, the Nags Head Board of Commissioners (Board) had first formally considered the new water allocation ordinance on April 1, 1985, and the need for such an ordinance had been discussed at three prior Board meetings in February and March of 1985. Since plaintiffs did not submit their bid until April 23, 1985, they would have likely discovered the Board's plans for a new water allocation ordinance had they made any effort to contact the Board prior to submitting their bid on the postal facility.

Plaintiffs contend that the new water allocation ordinance, adopted August 5, 1985, had the effect of requiring plaintiffs to "pave and improve a side street, grant additional setback areas, and pave a driveway access area, all at great additional and unforeseen expense, in order for the site to be assured of getting water." Plaintiffs also contend that, subsequent to the adoption of the new water allocation ordinance, the town of Nags Head adopted a new comprehensive plan which required plaintiffs to plant a buffer around the perimeter of their site. Furthermore, plaintiffs allege that the 880 foot water line requirement was a condition to site plan approval. It is not clear from the record, however, whether the water line requirement was a direct result of the new water ordinance or any other legislative change implemented by the town.

Plaintiffs cite *Johns–Mansville Corp. v. United States,* 12 Cl.Ct. 1 (1987), *vacated on other grounds,* 855 F.2d 1571 (Fed.Cir. 1988), for the proposition that the Claims Court imposes the following requirements, inter alia, before it will allow a contract to be equitably adjusted. "Increased costs must arise from 'conditions differing materially from those indicated in the bid documents,' and such conditions 'must also be reasonably unforeseeable on the basis of all the information available to the contractor.' " *Johns–Mansville, supra,* 12 Cl.Ct. at 33 (quoting *Mojave Enters. v. United States,* 3 Cl.Ct. 353, 357 (1983)). However, the court in *Johns–Mansville* advised that a contractor would have a viable claim for increased costs based on the fact that the government possessed superior knowledge which it failed to disclose. As the facts clearly indicate, this is not such a case. Both the Postal Service and plaintiffs had equal opportunity to make inquiry regarding proposed legislative changes in Nags Head regulations. There is no contention nor any indication in the materials before the court that the Postal Service was aware of these changes or had superior knowledge it was under a duty to disclose to plaintiffs relative thereto. Plaintiffs were obligated to make such inquiry, however, under the open advertising program and under the terms of the contract. These proposed legislative changes were discussed at Board meetings for at least two months prior to the date plaintiffs submitted their bid. Plaintiffs' contention that such legislative changes were "reasonably unforeseeable" on the basis of the information available to them is without merit.

Regardless of whether these legislative changes were unforeseeable, as plaintiffs contend, there remains no doubt that plaintiffs were contractually obligated by the "Permits and Responsibilities" clause in the contract to comply with all local laws and regulations, regardless of whether they became effective before or during the term of the contract. *See Norair Engineering Corp.,* ENGBCA No. 3375, 73–1 BCA para. 9955. Plaintiffs were not entitled to rely on any investigation made by Nelms or any other Postal Service employee to relieve themselves of their duty to make an independent investigation. *See Dattel Realty Co.,* PSBCA No. 2066, 89–2 BCA para. 21,874; *George R. Mackay,* AGBCA No. 454, 75–2 BCA para. 11,395; *Norair Engineering Corp., supra; Beacon–Hicksville, Inc.,* POD BCA No. 325, 71–1 BCA para. 8,624 (under "Permits and Responsibilities" clause, contractor must bear costs of complying with unexpected state and local requirements).[16] Further-

---

**16.** Two decisions awarding unexpected costs to contractors by contract boards of appeal, *Grun-*

*ley–Walsh Construction Co.,* GSBCA No. 2915, 70–2 BCA para. 8505, and *Beauchamp Associ-*

more, there is no indication in the record that plaintiffs consulted with an attorney at any point in their negotiations to obtain the Gray tract, or before preparing their bid on the post office project.

For the foregoing reasons, defendant is entitled to summary judgment on counts I and II of plaintiffs' complaint, and plaintiffs' cross motion for summary judgment on count I is denied. Plaintiffs are not entitled to recover on counts I and II of their complaint. Count III of plaintiffs' complaint remains. The parties are to advise the court within thirty (30) days of the date of this memorandum opinion as to how they intend to dispose of count III of the complaint. *See* notes 4 and 5 relative to count III. If Hicks had no authority to enter into the settlement agreement, there would most probably be no factual predicate for recovery by plaintiff under count III. *See Federal Crop Insurance, supra,* 332 U.S. at 384, 68 S.Ct. at 3.

*ates, Inc.,* GSBCA No. 843, 1964 BCA para. 4039, relied on by plaintiffs, can be distinguished on their facts. In *Grunley–Walsh,* liability was imposed on the government because of a specific contract clause which overrode the "Permits and Responsibilities" clause. In *Beauchamp,* liability was imposed based on the government's superior knowledge of unforeseen requirements.