Willie S. **EDWARDS**, Rosalyn V. Edwards, and John L. Dixon, Plaintiffs,

v.

The **UNITED STATES**, Defendant.

No. 522–88C.

United States Claims Court.

Jan. 17, 1991.

Howard P. Satisky, Raleigh, N.C., for plaintiffs.

Sandra McFeeley, Washington, D.C., for defendant.

## OPINION

LYDON, Senior Judge:

This government contract case is before the court, after a trial on the merits, with regard to an alleged oral modification of a contract entered into between plaintiffs and the United States Postal Service (Postal Service). Plaintiffs agreed, under the contract, to construct and lease to the Postal Service a postal facility in Nags Head, North Carolina. Two additional claims arising from the contract were disposed of by summary judgment in defendant's favor. *See Edwards v. United States*, 19 Cl.Ct. 663 (1990). After careful consideration of the evidence presented at trial, and the briefs of the parties, the court finds no express oral agreement enforceable against defendant and, therefore, the court renders judgment in favor of defendant.

## FACTS

The facts of this case were set forth in detail in the court's memorandum opinion granting defendant's motion for partial summary judgment, *see Edwards v. United States, supra*, 19 Cl.Ct. 663, and only those facts relevant to the remaining issue in dispute, the alleged oral agreement, will be set forth herein.

The Carolina District, from at least 1984 until September or October of 1986, was a functional unit of the Postal Service. One of the Carolina District's functions was to identify the need for postal facilities in North Carolina. Pursuant to Postal Service policy, a capital investment committee was established for the Carolina District. The capital investment committee had authority to review and approve or deny all capital investment projects, including the Nags Head project at issue here. Every project within the Carolina District, and any change to a project that increased its cost or scope, required the approval of the capital investment committee. Thus, before a contracting officer could enter into a contract for a postal facility, or implement a change to a project that increased the cost or scope, the contracting officer had to obtain the approval of the Carolina District.

In 1984, the Carolina District determined that a new postal facility was needed in the town of Nags Head, North Carolina. After Postal Service officials designated the preferred site area for the Nags Head project, they assigned a senior real estate specialist, Wallace Nelms (Nelms), to the project. Nelms' task was to investigate, choose and recommend a specific site or sites within the preferred area. Plaintiffs, Willie Edwards (Edwards) and John Dixon (Dixon), became interested in building the postal facility through Nelms, who was a close personal friend of Dixon's. Nelms informed plaintiffs and others that there was a site in the preferred area that was suitable and available for the postal facility.

The site Nelms recommended to plaintiffs and other potential bidders consisted of 101,059 square feet of land, and was controlled by Doll Gray (Gray), the Postmistress of Nags Head. *See Edwards, supra*, 19 Cl.Ct. at 665. Gray had informed Nelms that the site was suitably zoned for a postal facility, and that the site presently could be leased but not sold due to ongoing probate proceedings. In May of 1985, plaintiff Edwards negotiated an exclusive option to lease or buy Gray's land, despite the fact that Nelms had urged Gray not to give anyone an exclusive option. Nelms so urged Gray in order that all prospective bidders be given an equal chance to bid on the project. Nelms testified that plaintiffs' negotiation of an exclusive lease with Gray greatly upset him and caused hard feelings between plaintiffs and himself. He also testified that another person interested in bidding on the project could not bid on the Doll Gray tract of land because plaintiffs had gotten an exclusive option on the land from Doll Gray. During negotiations with Edwards, Gray made it clear that she want-

ed a postal facility on the land. Edwards' attorney drafted the lease, and it was executed by both parties on August 28, 1985. Significantly, the lease contained a clause which would void the lease if plaintiffs did not secure a lease with the Postal Service for rental of the building to be constructed on the land, but it is unclear whether the clause would restrict or prohibit other uses of the remainder of any land not required for a postal facility. It would appear that plaintiffs did not tell Doll Gray of their intention to use the remainder of the land for other purposes.

After plaintiffs secured a lease on the property, which consisted of 101,059 square feet, they submitted their bid on the Nags Head postal facility project, based on a 42,500 square foot facility.[1] In an earlier opinion, the court found that the bidding documents required plaintiffs to base their bid on a properly zoned site, or to obtain proper zoning if necessary. See Edwards, supra, 19 Cl.Ct. at 673. On July 29, 1985, plaintiffs were awarded a contract by the Postal Service for construction and lease of the postal facility.

The lease agreement entered into between the parties specified that the Postal Service would lease the building and land from plaintiffs for a base term of fifteen years at an annual rental of $41,133.64, with three optional five-year renewal terms. Plaintiffs intended to use the remainder of their 101,059 square foot parcel of land for additional development, since they believed the postal facility would require only about 42,500 square feet of land. Plaintiffs did not reveal their development plans, however, to any Postal Service official, including Gray or Nelms, prior to bidding on the project.

The contracting officer for the Nags Head project was Hugh Hicks (Hicks), who was manager of the Atlanta Real Estate Branch at the time. Hicks had authority to enter into contracts on behalf of the Postal Service, and to supplement and modify existing contracts within the realm of his delegated authority, and in accordance with applicable Postal Service rules and regulations. Under Postal Service regulations, Hicks' authority as a contracting officer was limited to $500,000 per lease.

During the course of the project, plaintiffs encountered unanticipated difficulties in meeting certain requirements imposed by the town of Nags Head. Due to the zoning ordinance governing plaintiffs' land on which the postal facility was to be built, plaintiffs were required to use 92,333 square feet for the project, rather than 42,500 square feet as they had originally anticipated. Plaintiffs did not check the applicable zoning ordinance before submitting their bid, although the bidding documents required them to base their bid on a properly zoned site. Plaintiffs were also required to make certain site improvements: street paving and improvement, water line installation, buffer zone installation and additional landscaping. In an earlier opinion, the court found that the agreement to lease placed the burden of complying with the town's zoning and site improvement requirements on plaintiffs. See Edwards, supra, 19 Cl.Ct. at 673.

After discovering the town's requirements, plaintiffs informed the Postal Service that they would be unable to complete the project without financial compensation for additional costs related to the site improvements. In addition, plaintiffs wanted increased rental because of the extra land required by the town's zoning laws. On June 12, 1986, plaintiffs Edwards and Dixon met, at their request, in Nags Head with contracting officer Hicks, Nelms, Al Brown (Brown), who was manager of the Postal Service's Design and Construction Branch in the Atlanta real estate office, and town officials to attempt to work out some of plaintiffs' problems and to get a building

---

1. The bid specifications called for bidders to build and lease to the Postal Service 3,676 square feet of enclosed building, 390 square feet

of platform, 22,462 square feet of parking, driveway and maneuvering, 13,970 square feet

permit.[2]

At the meeting, plaintiffs explained that site plan approval by the town of Nags Head was required before plaintiffs could get a building permit. To obtain site plan approval, Nags Head zoning restrictions required plaintiffs to dedicate approximately 1.9 acres (92,333 square feet) of their 2.3 acre (101,059 square feet) tract of land to the postal facility project. Parenthetically, the record supports the view that had Postal Service officials known prior to bid of the zoning requirements on the Doll Gray tract they would not have entered into a lease agreement with plaintiffs if they were to be expected to pay rent on 92,333 square feet for a 42,500 square foot postal facility. The town also required plaintiffs to pave a street, establish a buffer zone, install a water line, and furnish additional landscaping prior to site plan approval. Hicks and Brown testified at trial that they believed the main purpose of their presence at the June 12th meeting was to convince town officials to reduce or eliminate some of these requirements for site plan approval, so plaintiffs could get a building permit.

At the meeting, plaintiffs presented their estimates of the cost of complying with the town's requirements. Costs of site improvements were discussed, as well as the value of the additional land required by the zoning ordinance. Plaintiffs indicated that they could not proceed with the project unless they received some financial assistance with these costs. There is no indication in the record that plaintiffs threatened the Postal Service with either default or litigation relative to the lease agreement. Indeed, at trial, Dixon testified that the parties were "dealing" at the meeting, that is, plaintiffs wanted more money, and the Postal Service wanted to curb their expenditures.

Hicks testified at trial that he was sympathetic to plaintiffs' plight, and that he intended, at the close of the meeting, to pursue the possibility of an amendment to the lease agreement, if plaintiffs' cost estimates were confirmed to be reasonable, and if Hicks could obtain approval from his superiors.[3] At trial, plaintiff Dixon testified that Hicks did not indicate at the meeting that the Postal Service was willing to pay for the additional land required by the zoning ordinance. At no time before, during or after the June 12th meeting did Hicks seek or obtain approval from the Carolina District to amend the lease agreement. During the meeting, Hicks instructed Brown to check the accuracy of plaintiffs' cost estimates on site improvements when Brown returned to Atlanta, as Brown had not brought any cost manuals or data with him to Nags Head. Hicks instructed Nelms to check the accuracy of plaintiffs' land value estimate by obtaining sales prices on comparable parcels of land in Nags Head. While the record is conflicting on the point, a careful reading of the record shows rather clearly that there was no agreement with plaintiffs by Hicks to amend the lease. Hicks testified there was no agreement and pointed out that a number of matters remained to be considered after the meeting including, *inter alia*, verification and agreement on costs, land value confirmations, superior approval, etc.

Sometime between the June 12, 1986 meeting and June 20, 1986, Dixon met with Ms. Mabry, the vice-president of plaintiffs' lender for the Nags Head project. Dixon told Mabry about the $23,000 rent increase that plaintiffs claim was agreed upon at the June 12th meeting, but the bank would not loan plaintiffs any additional funds on the project until the bank received an amended lease agreement. Dixon and Edwards ultimately borrowed $60,000 as a personal loan to complete the postal facility, which was not part of plaintiffs' construction loan on the project. These facts

---

of landscaping and 1,726 square feet of sidewalks, for a total of 42,224 square feet.

**2.** Neither Nelms nor Brown had contracting officer authority in connection with the Nags Head project.

**3.** The obligation of the government, if it is to be held liable, must be in the form of an undertaking, not as a mere prediction or statement of opinion or intention. *Cutler–Hammer, Inc. v. United States,* 194 Ct.Cl. 788, 794, 441 F.2d 1179, 1182 (1971); *Eliel v. United States,* 18 Cl.Ct. 461, 467 (1989).

tend to support the view that no oral agreement to amend the lease ever came into being.

Shortly after the June 12th meeting, Hicks solicited the advice of his superior, Jerry Adkins (Adkins), who was at the time General Manager of the Real Estate Division in the Postal Service's Southern Region in Memphis, Tennessee. Pursuant to a request from Adkins, Hicks prepared a memorandum to file dated June 20, 1986, which described the status of discussions at the June 12th meeting concerning an amendment to the Nags Head lease agreement, and actions taken subsequent thereto. Since Hicks was sympathetic to plaintiffs' situation, the record supports an inference that Hicks worded the memorandum to persuade his superiors to help plaintiffs. In the memorandum, Hicks outlined the problems plaintiffs had described at the June 12th meeting with regard to zoning, paving, installing a water line, planting a buffer and landscaping. Hicks noted that plaintiffs "wanted payment for the extra land required to be determined by value," and that plaintiffs also requested $45,000 for the site improvements. The memorandum noted that Al Brown had prepared an estimate for site improvements, to which plaintiffs ultimately agreed, of $30,500. The memorandum then described how the value of the additional land used would be calculated and capitalized into the rent. The memorandum noted that the value of the entire parcel was estimated to be $301,-500.[4] After subtracting the value of the parcel that would have been used in any event, $138,650, the remaining sum of $162,850 would be capitalized into the rent. By adding $30,500 (site improvements) and $162,850 (land value), Hicks apparently erroneously arrived at a total of $237,850. Plaintiffs contend that the correct sum of those two figures should be $193,350, which when capitalized at twelve percent would result in a yearly rent increase of $23,202.

After receiving Hicks' memorandum, Adkins wrote back on June 26, 1986, asking Hicks to forward the complete Nags Head project file, and informing Hicks that Adkins would discuss the problem with regional counsel and with Postal Service headquarters. Hicks complied by having Nelms send the file to Adkins on July 11, 1986. After receiving the Nags Head file, Adkins sought the advice of Travis Lynch (Lynch), a Postal Service attorney in the Southern Region, regarding the proposed lease amendment. Lynch advised Adkins that the difficulties encountered with the town's requirements were plaintiffs' responsibility under the contract.

Plaintiffs argue that the alleged "new agreement" resulting from the June 12th meeting and memorialized in the Hicks memorandum entitles plaintiffs to an additional $23,202 per year in rent. Although Hicks discussed with plaintiffs the possibility of an amendment to the lease agreement at the June 12th meeting, any such amendment was contingent upon the establishment of plaintiffs' cost estimates and approval from higher authorities. As of June 20, 1986, Hicks had not sought approval of plaintiffs' proposal from the Carolina District.

Approximately two weeks after the June 12th meeting, Dixon went to Hicks' office in Atlanta to pick up a lease agreement for another postal facility project in which plaintiffs were involved at Emerald Isle, North Carolina. While he was there, Dixon claims Hicks handed him a document which purportedly modified the Nags Head lease agreement. However, Hicks took the document back from Dixon after speaking with Adkins on the telephone, explaining that Adkins wanted to see it first. Hicks denies ever preparing such a document, much less handing it to Dixon. Hicks believes that he may have handed Dixon an envelope containing a letter addressed to plaintiffs advising them of the Postal Service's denial of their claim for additional costs on the Nags Head project, which included a paragraph advising plaintiffs of their appeal rights. After Adkins informed Hicks that plaintiffs' claim had to be in

---

4. The $301,500 figure was supplied by plaintiffs, who obtained an appraisal of the land from a

Nags Head real estate company in October of 1985.

writing before they could be advised of their appeal rights, Hicks probably took the letter back from Dixon, and did not mail or give it to plaintiffs at that time. The record as a whole supports Hicks' version of this disputed matter.

On or about October 1, 1986, Hicks discussed with plaintiff Dixon the possibility of amending the lease agreement to allow plaintiffs to build a larger building for an increased rent payment. When Hicks was unable to get Postal Service approval for such an amendment, Hicks conveyed that information to Dixon.

At plaintiffs' request, another meeting was held on October 10, 1986, at the Atlanta Field and Real Estate Buildings Office, attended by plaintiffs Edwards and Dixon, and Hicks, Brown, Nelms, Lynch and other Postal Service officials. Discussions were held concerning construction of a larger building in return for a higher rent payment, but no agreement was reached. Lynch identified three alternatives open to plaintiffs relative to the original lease agreement. First, Lynch suggested a no-cost termination of the lease agreement, whereby the contract would be cancelled, releasing both parties from further obligation. Plaintiffs countered with a request for compensation to cover expenses of approximately $3,000 incurred to date, and when the Postal Service refused, plaintiffs declined to terminate the contract. Second, Lynch advised plaintiffs that if they refused to perform the contract after receiving a notice to proceed, they would be subject to termination for default and for excess reprocurement costs under the provisions of the lease agreement.[5] Furthermore, Lynch warned plaintiffs that if they were to submit another bid on the Nags Head project after defaulting, they might

be deemed to be non-responsible bidders by the contracting officer.[6] At trial, plaintiff Dixon characterized Lynch's warning as a threat to "blacklist" plaintiffs, that is, to prevent plaintiffs from bidding on any future Postal Service contract. The record indicates that Lynch's comment was intended to advise plaintiffs of the unlikely possibility that plaintiffs would be chosen to receive the reprocurement award on Nags Head if they defaulted. The comment did not amount to a threat to "blacklist" plaintiffs from future contracts. Finally, Lynch suggested that plaintiffs could perform the contract and submit a claim for any relief they believed due them.

On October 10, 1986, contracting officer Hicks issued to plaintiffs a notice to proceed with performance of the contract.

Another meeting was held in Atlanta on October 17, 1986, attended by plaintiffs Dixon and Edwards, and Hicks, Lynch, Nelms and Brown of the Postal Service. Further discussions were held regarding the lease agreement. In Lynch's opinion, the Postal Service could not justify paying $39,000 [sic] per year for an additional 800 square feet of building space. In a memorandum to file dated November 3, 1986, Hicks stated that plaintiffs offered to build a larger (4,480 square foot) building for $69,000 annual rental. Hicks testified at trial that when he presented this offer to the Carolina District, they rejected it. The memorandum also stated that the Postal Service discussed, but did not offer a "mutual termination," and that plaintiffs wanted reimbursement for costs incurred. At trial, Hicks testified that Lynch did indeed offer plaintiffs a no-cost mutual termination at the meeting, but the offer was withdrawn when plaintiffs demanded reimbursement of costs incurred to date. Hicks

---

**5.** It should be noted that a threat to do what one is entitled to do does not amount to duress nor does it serve to provide any merit to plaintiffs' position. *See Johnson, Drake & Piper, Inc. v. United States,* 209 Ct.Cl. 313, 322, 531 F.2d 1037, 1042 (1976) (it is not duress to make good faith use of remedies prescribed under a contract).

**6.** A defaulting contractor *may* be considered for award of the reprocurement contract, if the contractor is found to be responsible and capa-

ble of performance, but such a decision lies within the contracting officer's discretionary authority. *Venice Maid Co. v. United States,* 225 Ct.Cl. 418, 429, 639 F.2d 690, 697 (1980); *see also Siller Bros., Inc. v. United States,* 228 Ct.Cl. 76, 84, 655 F.2d 1039, 1044–45 (1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982); *Churchill Chemical Corp. v. United States,* 221 Ct.Cl. 284, 293, 602 F.2d 358, 364 (1979).

explained his statement in the memorandum as a likely typographical error. Lynch noted at trial that he consistently, on other occasions, found Hicks' memoranda to be inarticulately drafted. The memorandum also noted that the Postal Service officials at the meeting pointed out to plaintiffs that they obtained the land for $100,000, and if it was now worth at least $300,000, plaintiffs have made a $200,000 profit in one year. The memorandum ended with the statement that "nothing was resolved. [Plaintiffs] feel they are entitled to more rent because they had to give more land than required." [7]

Under protest, plaintiffs completed construction of the postal facility pursuant to the original bid specifications. After two unsuccessful attempts to obtain reimbursement for claimed additional costs from the contracting officer in 1987 and 1988, plaintiffs filed suit in this court on September 6, 1988.

Several Postal Service rules and regulations are pertinent to this case, including provisions from the Postal Contracting Manual (PCM) and the Postal Service Real Estate Handbook "Realty Acquisition and Management" (RE-1).[8] Section 1-3 of the RE-1 handbook states in part:

> While this handbook is intended as the basic guidance for real estate operations, other references must be used as well. These include Headquarters and regional publications, i.e., Publication 190, *Capital Investment Policies and Procedures;* Publication 191, *Capital Investment Implementation Instructions;* Publication 41, *Postal Contracting Manual, Real Estate and Buildings Bulletins....*

Publication 190, entitled *Capital Investment Policies and Procedures*, establishes policies, procedures and responsibilities for Postal Service capital investments and applicable operating expense projects, including acquisition of facilities by new construction for lease to the Postal Service. As part of its implementation policy, Publication 190 states in part:

> Any change altering the intent of the project or causing the approved total dollar limitation to be exceeded shall be submitted to the appropriate authority as outlined in chapter 3 for approval by the functional requirement organization prior to proceeding with the project. The functional requirement organization will issue authorization and fund certification documentation from its financial plan.

Publication 190 further provides, in section 311.5: "No individual project or procurement shall be committed unless it has approval from the appropriate authority

---

**7.** At trial, Dixon testified on direct examination that at the October 17th meeting, Lynch asked Dixon if he wanted "out of the deal," and Dixon responded by asking for reimbursement of $3,200 for the building permit, and the cost of two airline tickets to Atlanta. On cross-examination, Dixon testified that he did not recall Lynch offering a no-cost option. While there is conflicting testimony on the point, the court is persuaded that plaintiffs were offered a mutual termination at no cost with no detriment to either party, *i.e.*, both parties would walk away as if the lease agreement never existed. Plaintiffs refused this offer by insisting on a cash payment as well. The court infers from the record as a whole that plaintiffs did not favor any termination of the existing lease. As indicated earlier, if plaintiffs did not build a postal facility under the lease agreement, its lease-purchase option with Doll Gray would become null and void. When one bears in mind that the total purchase price of the Doll Gray property was capped at $150,000 and the land at the time was worth over $300,000, and rising, it is small wonder plaintiffs did not favor termination of the lease. The face saving ploy of plaintiffs was

to insist on a cash payment for any termination thus providing an air of validity for their position yet insuring no termination of the lease agreement.

**8.** Defendant's expert witness on Postal Service real estate policies and regulations, James Coe, testified that the following documents were "regulations of the Postal Service," as defined in 39 C.F.R. § 211.2 (1985): resolutions of the Board of Governors of the Postal Service, bylaws of the Board of Governors, domestic mail manual, postal operations manual, administrative support manual, employee labor relations manual, financial management manual, postal contracting manual, Publication 42, portions of the former Postal Service Manual retained in force, headquarter circulars, management instructions, regional instructions, handbooks, delegations of authority, and other regulatory issuances and directives of the Postal Service. Coe testified specifically that the real estate handbook and Publication 190 are included within the definition of "Postal Service regulations."

and has been documented as to compliance with the criteria outlined in chapter 5."

Publication 191, entitled *Capital Investment Implementation Instructions*, describes the general responsibilities for implementing the Postal Service's capital investment authority. Section 1–201.4 of the PCM in effect in June 1986 defines "contract" to mean: "all types of agreements and orders for the procurement of supplies or services. It includes awards and notices of award, contracts of a fixed-price, cost, [and] cost-plus-fixed-fee [nature].... It also includes supplemental agreements with respect to any of the foregoing."

Section 1–201.2 of the PCM defines "contract modification" to mean:

any written alteration in the specification, delivery point, rate of delivery, contract period, price, quantity, or other contract provisions of an existing contract, whether accomplished by unilateral action in accordance with a contract provision, or by mutual action of the parties to the contract. It includes (i) bilateral actions such as supplemental agreements, and (ii) unilateral actions such as change orders, administrative changes, notices of termination, and notices of exercise of a contract option.

Section 1–403 of the PCM describes the responsibilities of contracting officers. Section 1–403.1 requires that contract modifications for field activities that were anticipated to exceed $100,000, and other actions presenting legal questions of unusual significance be coordinated with the Postal Service's regional counsel. Section 1–403.2 of the PCM states:

Before awarding a contract, the contracting officer must:

(a) Obtain all the required reviews and approvals (see 1–401.2, 1–403.3, and 3–302.3(d)).

(b) Ensure that sufficient funds have been budgeted and approved at the proper management level.

(c) Ensure that all requirements of the law and the *Postal Contracting Manual* are met.

Section 8–202.4.2 of the RE–1 provides:

**Effect on Cost.** The Design and Construction Branch must refer any recommended changes in the building during the construction that will result in changes in the cost of the structure to the contracting officer for approval and for negotiation and adjustment of the rent. The Design and Construction Branch must furnish an estimate of the fair and reasonable amount by which recommended changes will increase or decrease the cost of the building. Where the cost of construction will be increased or decreased as a result of changes, the contracting officer must obtain approval from the requirement organization and acquire an amended Form 7437, *Real Estate and Building Services Request.* The contracting officer must negotiate with the bidder, and complete form 7401–A, *Modification of Agreement to Lease....* The bidder must have the approval of the contracting officer before initiating changes which will increase or decrease cost.

Section 8–202.4 of the RE–1 in effect in June 1986 states, with regard to changes in lease/construction contracts:

Minor departures from the approved plans and construction requirements must be referred to the requirement organization for approval. If it is determined that such departures will not result in cost changes and/or will not affect operations, they may be resolved between the Design and Construction Branch and the bidder.

At trial, James Coe, an expert on Postal Service real estate regulations, identified this section as the most significant provision in the Real Estate Handbook regarding the limitations on a contracting officer's authority. Coe explained that a contracting officer has full authority to execute the contract at fair market value within the scope of the above requirements. Coe also testified that if a contracting officer wanted to accept a 100,000 square foot bid for a 42,500 square foot facility site, he must first consult the requiring authority. Coe emphasized that when the land area is over twice the amount specified in the solic-

itation, that is a significant change beyond the authority of the contracting officer.

## DISCUSSION

### A. The Parties' Contentions

Plaintiffs contend that they entered into a binding oral agreement with the Postal Service on June 12, 1986, which was memorialized by Hicks' June 20, 1986 memorandum to file. Moreover, plaintiffs claim that Hicks actually prepared and signed a written contract amendment or modification setting forth the terms allegedly agreed upon. At trial, Hicks denied entering into any oral agreement with plaintiffs, or preparing any written amendment or modification to the contract.

Plaintiffs argue that all of the elements of a contract have been met, that is, offer and acceptance, mutuality of intent, consideration, and lack of ambiguity with regard to the major terms. Plaintiffs appear to argue in the alternative that the alleged agreement took the form of an accord and satisfaction, citing the presence of the requisite elements, that is, proper subject matter, competent parties, meeting of the minds and consideration. In addition, plaintiffs allege that contracting officer Hugh Hicks had the requisite authority to enter into an express oral contract or an accord and satisfaction.

Defendant's position is that no express oral contract came into being as a result of the June 12th meeting between the parties. Defendant cites lack of unambiguous acceptance of plaintiffs' offer, and lack of consideration as missing elements essential to contract formation. In addition, defendant points out that the provisions of the lease agreement, as well as Postal Service rules and regulations, mandate that amendments or modifications to the lease agreement must be in writing on a designated Postal Service form. Defendant maintains that contracting officer Hicks had no authority to enter into the alleged agreement since he did not obtain approval to make such an agreement from the Carolina District, which is the requiring Postal Service authority, as required by Postal Service regulations. Finally, defendant argues that, even if the court agrees with plaintiffs that an oral agreement was reached at the June 12th meeting, any such agreement is void and unenforceable because Hicks violated Postal Service regulations and policies by entering into an agreement without prior approval from the requisite Postal Service authorities.

### B. The Merits

 The issue before the court is whether an express oral agreement exists between plaintiffs and the Postal Service. The elements of an express oral contract are the same as those of a written contract: mutuality of intent to be bound, definite offer, unconditional acceptance, and consideration. *See Essen Mall Properties v. United States*, 21 Cl.Ct. 430, 440 (1990); *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 339 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984); *City of Klawock v. United States*, 2 Cl.Ct. 580, 584 (1983), *aff'd*, 732 F.2d 168 (Fed.Cir.1984). In addition, since one of the parties to the contract is the federal government, plaintiffs must show that "the officer whose conduct is relied upon had actual authority to bind the government in contract." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *see also Essen Mall, supra*, 21 Cl.Ct. at 440. The facts clearly show that the Postal Service did not manifest an unconditional acceptance of plaintiffs' offer to modify the existing lease agreement at the June 12th meeting, or at any time thereafter. Indeed, Hicks testified he never made any agreement with plaintiffs to amend the existing lease. At best, the record shows, Hicks agreed to look into the matter. In fact, Hicks lacked authority to accept plaintiffs' proposal at the June 12th meeting. Postal Service rules and regulations cited above indicate that Hicks had no authority to enter into an agreement or contract modification of the magnitude proposed by plaintiffs, which would have increased the rent by $23,202 per year. Postal Service regulations make it clear that such an increase in the size, cost and scope of the

project required Hicks to obtain approval from his superiors, including the capital investment committee of the Carolina District. It is undisputed that Hicks never sought or received such approval.

■ It is elementary that, regardless of whether Hicks believed himself to have the authority to accept these proposed terms, plaintiffs bear the burden of ascertaining the scope of authority of those Government officials with whom they deal. The Government is not bound by the acts of its agents that exceed the agent's authority, even though the agent believes himself to have such authority. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990); *De Roo v. United States*, 12 Cl.Ct. 356, 360 (1987); *Prestex, Inc. v. United States*, 3 Cl.Ct. 373, 377 (1983), *aff'd*, 746 F.2d 1489 (Fed.Cir.1984).[9] Thus, even if Hicks had accepted plaintiffs' proposal, plaintiffs were bound to ascertain whether Hicks had the authority to bind the Postal Service to such an agreement. *See Goolsby v. United States*, 21 Cl.Ct. 629, 632 (1990) (citing *Miles Farm Supply, Inc. v. United States*, 14 Cl.Ct. 753, 757 (1988)). The Postal Service rules and regulations indicate that Hicks had no authority to bind the Postal Service to such a drastic modification to the lease agreement without approval from the Carolina District.

■ There is insufficient evidence in the record to establish that the parties agreed to a lease modification, a settlement, or an accord and satisfaction. The fact that subsequent meetings, discussions and negotiations were held into October of 1986 indicates that neither party believed that the June 12th meeting had culminated in an agreement resolving the parties' difficulties.[10] As Hicks concluded in his memorandum to file dated November 3, 1986, "nothing was resolved" because plaintiffs insisted on payment for the amount of land required by the Nags Head zoning ordinance to construct the postal facility.

■ Plaintiffs appear to argue in the alternative that an accord and satisfaction arose at the June 12th meeting. The elements of an effective accord and satisfaction cognizable in this court are "proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 59, 343 F.2d 951, 955 (1965). In addition, an accord and satisfaction "is subject to the same rules respecting its validity as was the original contract. One of these rules is that the agreement must be made on the government's behalf by an officer authorized to do so, and it must have been within the scope of that officer's authority. If either of these factors is missing, the agreement is illegal and unenforceable." 6 J. McBride & I. Wachtel, *Government Contracts* § 40.50[5], at 40–38. As discussed above, the Postal Service manifested no unambiguous acceptance of plaintiffs' offer to modify the lease agreement. Moreover, contracting officer Hicks had no authority to enter into a new agreement or to effect a contract modification without approval

---

9. For this reason, plaintiffs' reliance on a provision of the Federal Acquisition Regulations is misplaced. Plaintiffs cite 48 C.F.R. § 33.210, a provision governing a contracting officer's authority pursuant to contracts, such as the lease agreement between the parties, which are governed by Contract Disputes Act of 1978 (CDA). The provision states, in pertinent part:

[C]ontracting officers are authorized, within any specific limitations of their warrants, to decide or settle all claims arising under or relating to a contract subject to this Act. This authorization does not extend to [fraud claims or claims which another federal agency is authorized to administer.]

It can be said that the Postal Service rules and regulations cited above are "limitations" on Hicks' authority to "decide or settle all claims" with regard to the lease agreement. Moreover, it is not at all clear that this provision applies to an entirely new agreement outside of the existing lease agreement. Such a new agreement may or may not be governed by the CDA.

10. *See Kilmer Village Corp. v. United States*, 139 Ct.Cl. 231, 236, 153 F.Supp. 393, 397 (1957) (even extensive negotiations do not ripen into agreement where government agent with authority to execute lease failed to do so); *Essen Mall Properties v. United States*, 21 Cl.Ct. 430, 442 (1990) (fact that further negotiations took place indicate that no agreement to lease was reached four months earlier).

from requisite Postal Service authorities, pursuant to Postal Service rules and regulations. Finally, though plaintiffs argue that settlement of a dispute is sufficient consideration to support an accord and satisfaction, it is not at all clear from the record that a dispute existed between the parties at the June 12, 1986 meeting. Plaintiffs concede that they made no formal claim to the contracting officer "until a later date," *i.e.*, July 8, 1987. Furthermore, the purpose of the June 12th meeting was an attempt by the parties to work out plaintiffs' difficulties with the town's requirements, as stated in Hicks' June 20th memorandum. Plaintiffs cannot manufacture a dispute that did not exist at the time, and then claim that they offered to settle the "dispute" as consideration for an alleged accord and satisfaction. Thus, it is clear that no viable accord and satisfaction was executed between the parties at the June 12th meeting or any time thereafter.

█ Finally, plaintiffs argue that the alleged agreement need not be in writing in order to be valid, binding and enforceable. Postal Service regulations clearly mandate, however, that "where the cost of construction would be increased or decreased as a result of changes, the contracting officer must obtain approval from the requirement organization and acquire an amended Form 7437 ... and complete Form 7401–A [Modification of Agreement to Lease]." RE–1 § 8–202.4.2. This provision requires the contracting officer to get the approval of the requiring organization for changes in the cost of a construction project. Hicks testified at trial that he obtained capital investment committee approval for every change order he issued as a contracting officer. Moreover, nowhere in the Postal Service rules or regulations is there any provision to authorize the oral amendment of a written lease. Defendant's expert Coe emphasized at trial that Form 7401–A is the only form by which an agreement to lease may be modified. Clearly, Postal Service regulations require that certain procedures be followed to effect a contract modification. Plaintiffs do not dispute the fact that these procedures were not followed. Contracting officer Hicks apparent-

ly took the first step toward obtaining approval from the requirement organization (the Carolina District) when he submitted plaintiffs' file and lease modification proposal to Jerry Adkins, general regional manager of the Real Estate Division in Memphis, Tennessee. Plaintiffs do not deny that no such approval was forthcoming from Adkins, or from the Carolina District.

Plaintiffs' reliance on cases such as *Penn–Ohio Steel Corp. v. United States*, 173 Ct.Cl. 1064, 354 F.2d 254 (1965), and *United States v. Purcell Envelope Co.*, 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620 (1919), for the proposition that the alleged oral agreement need not be in writing or formally executed to be binding is misplaced. In *Penn–Ohio Steel*, the parties contemplated execution of a formal instrument, but the court found the formal instrument was not essential to consummate the agreement because the government official who had actual authority to bind the government had given his verbal approval, subject only to his later *pro forma* written approval. In *Purcell Envelope*, the execution of a written instrument was a mere technicality, since it was customary for the government to manifest acceptance of the bidder's offer by sending the bidder an award order. However, with regard to the case at bar, under applicable Postal Service rules and regulations, a binding agreement or modification to an agreement must be in writing, using certain Postal Service forms, and must be executed by a Postal Service official with actual authority to bind the government. *See, e.g., SCM Corp. v. United States*, 219 Ct.Cl. 459, 464, 595 F.2d 595, 598 (1979) (where pertinent regulations require that a contract modification be written, an oral modification not reduced to writing and signed by both parties is ineffective); *Russell Corp. v. United States*, 210 Ct.Cl. 596, 608, 537 F.2d 474, 481–82 (1976) (same), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865, 869 (Fed.Cir.1987) (oral modification of a written contract, which may be modified only by bilateral written agree-

ment, is ineffective) (citing with approval *SCM Corporation, supra*). Thus, even if the court were to conclude that an oral agreement arose at the June 12th meeting, such an agreement would be unenforceable as contrary to Postal Service rules and regulations. *See Texas Instruments Inc. v. United States*, 922 F.2d 810, 814–815 (Fed.Cir.1990) (government agent may not bind government to agreement when such an act is directly forbidden by U.S. laws or regulations).[11]

Finally, although defendant does not specifically raise the issue, there is a statutory provision requiring that all binding government contracts be in writing: "An amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of ... a binding agreement between an agency and another person (including an agency) that is ... in writing...." 31 U.S.C. § 1501(a)(1)(A) (1988). In *Narva Harris Constr. Corp. v. United States*, 216 Ct.Cl. 238, 244, 574 F.2d 508, 511 (1978), the Court of Claims noted that although this provision, 31 U.S.C. § 200 (now § 1501), may not be enough to preclude recovery on a contract implied-in-fact, it may preclude recovery on an express oral contract. Although this provision is rarely, if ever, the sole basis for invalidating an otherwise valid express oral agreement, its existence is worth noting. Even though this provision is contained in a subchapter on appropriations, and therefore it may not be strictly applicable to these circumstances, as the Postal Service may be considered primarily a non-appropriated fund agency, the provision manifests the general view that generally oral agreements provide a very shaky basis for the granting of relief by way of money judgments.

## CONCLUSION

For the foregoing reasons, the court finds that, although the parties engaged in extensive discussions and negotiations, no enforceable oral agreement ever came into being between the parties to modify or replace the written lease agreement which binds both parties. Accordingly, plaintiffs' third claim for relief set forth in their complaint, as amended, is without merit. The Clerk of the court is directed to enter judgment dismissing plaintiffs' complaint. No costs.

---

**11.** Plaintiffs' reliance on contract appeals board decisions, such as *Essex Electro Engineers, Inc.*, ASBCA No. 30118, 88–1 BCA ¶ 20,440; and *Federal Electric Corp.*, ASBCA No. 24002, 82–2 BCA ¶ 15,862, are unavailing. Plaintiffs assert that these cases are factually identical to the case at bar, and that they establish plaintiffs' right to prevail in this action. The court does not agree. Both *Essex Electro* and *Federal Electric* concern oral contract modifications that were memorialized in written documents, but were not on the "required" forms. In *Essex Electro,* the documents memorializing the oral modifications were extremely detailed, covered fifteen single-spaced typed pages, and reflected a complete consideration of all the issues, with no loose ends. In both cases, the ASBCA found that all the elements of a binding agreement were present in the documents, and held the agreements enforceable despite the fact that they were not on standard contract modification forms. These ASBCA decisions are distinguishable from the case at bar. All the elements of a binding oral agreement are not present here. There is no meeting of the minds, no acceptance of plaintiffs' offer and no authority on the part of Hicks or any other government agent to bind the government.