**Pat KENNEY, d/b/a J & K Associates, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–470C.

United States Court of Federal Claims.

July 21, 1998.

David E. Kuns, Dayton, OH, for Plaintiff.

Peter S. Levitt, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Kirk T. Manhardt, for Defendant.

## OPINION

LYDON, Senior Judge.

This case is before the court on defendant's motion for summary judgment. Plaintiff, Pat Kenney, doing business as J & K Associates, seeks damages in the amount of $26,172.50 incurred for breach of an alleged contract for personnel training materials. It is undisputed that there is no written contract between the parties. The question posed by plaintiff is whether the government entered into an implied-in-fact contract with plaintiff. Defendant contends that it did not enter a valid contract with plaintiff and has moved for summary judgment. Plaintiff opposes defendant's motion. After oral argument and supplemental briefing the court grants defendant's motion.

### FACTS

The following facts are undisputed. Plaintiff, doing business as J & K Associates, engages in the business of developing and providing various courses and programs relating to human resource development and training. Plaintiff has been providing such

courses and programs to government agencies for approximately twenty-three years.

The parties have separately submitted exhibits spanning the period from April 10, 1992 through July 6, 1993, documenting the course of plaintiff's negotiations with Employee Development Specialist (EDS) Leonard Murphy (Murphy), and later with EDS Karen Galway (Galway) concerning the alleged contract for training services. A review of these exhibits indicates that the negotiations took place in two phases and were separated by a lengthy break. The contents of these documents, mostly faxed letters, reflect a progression from initial discussions about the Navy's objectives, to the cost and proposed course outlines to meet those objectives, to discussions about the number of sessions and potential dates for holding the sessions.

In early 1992, EDS Murphy, employed by the Naval Weapons Station, Department of the Navy, in Concord, California (Concord Station), contacted Kenney to inquire about her firm providing an advanced supervisory development course for Navy employees. Between April and June 1992, Murphy and Kenney modified certain aspects of plaintiffs proposed course outline in order to fit the needs of the Navy, estimated that the proposed course would be conducted at Concord Station approximately ten or twelve times, and scheduled (and subsequently rescheduled) the first three dates and locations for presentation of the course. Although Murphy does not recall having had any direct contact with plaintiff after June 1992, Kenney wrote or faxed to him two letters, one dated August 27, 1992, the other September 28, 1992. In addition to requesting further feedback on the proposed course content, Kenney's September 28, 1992 letter refers to a September 8, 1992 telephone conversation with Murphy. In any event, this letter is the last document linking Murphy to the negotiations with plaintiff.

Sometime during September 1992, negotiations ceased between plaintiff and Murphy. It was about this time that Concord Station underwent a change in command. The new command decided that supervisory training was a less important matter than certain other, high priority matters, and that command would reevaluate the need for supervisory training the following summer. There is no indication that plaintiff made a claim for breach of contract after the negotiations with Murphy ceased.

On June 28, 1993, negotiations resumed between the parties. This time, however, EDS Galway negotiated on behalf of the Navy and Dee Cassidy (Cassidy) on behalf of J & K Associates. On June 28, Galway called Cassidy and discussed the possibility of scheduling some training sessions and lining up potential instructors for the supervisory training course. In response Cassidy faxed a letter to Galway which stated in pertinent part:

> Thanks for your call today. I am certain that we can schedule to accommodate your training needs for the supervisory-leadership course that we were discussing.
>
> Advance Supervisory Development (Leadership Techniques for the 90's) is a GREAT program. I am very pleased that you hope to run this course....
>
> STOP: Just received your second call. August 23rd will be fine. We will do some simple rescheduling. If you can locate satisfactory classroom availability, J & K will be there....
>
> I also spoke to her [Kenney] about the assessment area. She prefers to use the PEOPLE Process because where the Myers–Briggs just does the self-assessment The (sic) PEOPLE Process teaches self-assessment and how to access those you are supervising, which we had discussed with Murph [EDS Murphy].
>
> I am including with this FAX copies of Dr. Pat Kinney (sic) and Dr. Larry McKenna's biographical data sheets for your review. Another instructor who may do this course at a later date is Joseph Veitz.
>
> I will be in touch with you again before your boss comes back on Thursday.

Subsequently, in a letter dated July 5, 1993 but dated stamped received by the Navy on July 19, 1993, Kenney wrote to Galway the following:

> This letter confirms the following date(s), cost(s), for this/these training program(s):

23–24–25–26–27 Aug 93—Leadership Techniques for the '90s Mon, Tue, Wed, Thu, Fri—8am to 4pm—$5,300.00 plus cost of personality inventory People Process, per person ($9.50)

13–14–15–16–17 Sep 93—Leadership Techniques for the 90's Mon, Tue, Wed, Thu, Fri—8am to 4pm—$5,000.00 plus cost of personality inventory People Process, per person ($9.50)

27–28–29–30 Sep and 01 Oct 93—Leadership Techniques for the 90's—8am to 4pm—$5,000.00 plus cost of personality inventory People Process, per person ($9.50)

The above costs are for 25 participants in each course.

J & K furnishes all training materials—participant manuals, sign-in sheets, evaluations, name tents, handouts, participant course-completion certificates, other pertinent course materials, and a qualified instructor (bio enclosed). It is understood that your agency will furnish classroom space, an overhead projector, a VHS player and monitor for showing videos, and a flip chart and/or chalkboard.

The course materials will be UPS'd to the above address, well before class times, unless you tell us differently.

Thank you for this opportunity to provide training programs for your personnel.

On July 6, 1993, Cassidy faxed to Galway the following:

Our secretary said that you had called in regards to the instructor for the course that we had *tentatively* scheduled for your facility, Leadership Techniques in the 90's on for the week of 23 August 93. As of Friday, I have Dr. McKenna tentatively

scheduled, however, *until we have a firm contract with your organization,* I can't get a contract with him. Again, however, this is the instructor that I believe will do the course. I have however, included with this FAX the biographical data sheets of the other instructors who are also well qualified to teach this course.

Again, if you need any more information before your meeting, please call or FAX and I'll get back to you immediately!!

(Emphasis added).

A few weeks later, on July 22, 1993, Clifford Shaw (Shaw), the Training Officer at the Concord Station and Galway's supervisor, telephoned plaintiff and canceled the scheduled sessions. On defendant's copy of the letter dated July 5, 1993 from Kenney to Galway, Shaw noted his conversation with Kenney and wrote, "Called to tell Pat [Kenney] the Board has decided not to do this now." Similarly, on plaintiff's copy of the same letter, Kenney wrote, "Cliff called & cancelled (sic)." Consequently, plaintiff did not conduct any training courses for the Concord Station. On May 22, 1994, plaintiff submitted a claim to Shaw in the amount of $26,172.50.[1] Shaw denied plaintiff's claim and plaintiff subsequently filed a complaint in this court on July 24, 1995.[2]

## DISCUSSION

Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56. The moving party, here the government, bears the burden of demonstrating that there are no genuine issues of material fact and

---

1. It is not clear from the plaintiff's submissions how it calculated the amount of $26,172.50. In its complaint plaintiff alleges that it "proceeded to order course materials, make travel and other arrangements and enter into a contract with Larry McKenna to instruct the scheduled courses, thereby incurring various costs in preparing to conduct the program." At oral argument, however, when explaining how plaintiff computed the amount of $26,172.50, plaintiffs counsel stated "By subtracting—since she didn't put it on, she didn't incur the certain necessary expenses of putting it on, hiring an instructor to go out there, travel, lodging, and all those things." To the extent that the amount of dam-

ages sought by plaintiff was incurred in attempting to induce a contract with defendant those sums are not recoverable. *See Byrne Organization, Inc. v. United States,* 152 Ct.Cl. 578, 587, 287 F.2d 582, 587 (1961).

2. Plaintiff does not make any allegation of bad faith and the record does not contain even a hint, inference or suggestion rebutting the presumption that government officials act conscientiously and in good faith in the discharge of their duties. *See Spezzaferro v. Federal Aviation Admin.,* 807 F.2d 169, 173 (Fed.Cir.1986).

that it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, all of the facts must be construed in a light most favorable to the nonmoving party, with all reasonable inferences drawn in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once a moving party has supported its motion with affidavits or other evidence that would establish its right to summary judgment, the nonmoving party must respond with countering evidence sufficient to create a genuine issue. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). In countering a motion for summary judgment, the nonmoving party cannot rest on mere denials and self-serving conclusions, unsupported by specific facts contained in the record. *Sweats Fashions, Inc.*, 833 F.2d at 1562.

Defendant contends that it is entitled to summary judgment because plaintiff did not enter into a valid contract with the Navy. First, defendant argues that Murphy, who plaintiff alleges entered into the contract with plaintiff, did not possess the authority to bind the government in contract. Second, defendant argues that Navy regulations required that a contract for training services be in writing. In response, plaintiff argues that Employee Development Specialists have authority to bind the government in certain circumstances, specifically the purchase of "off-the-shelf" training programs that cost less than $25,000. Additionally, plaintiff argues that she and Murphy agreed to schedule the presentation of the course over two years so as to stay within the $25,000 limit. Finally, plaintiff argues that contracts for the purchase of program services do not have to be in writing. Plaintiff's briefs in opposition to defendant's motion for summary judgment are confusing and, significantly, do not cite any authority in support of plaintiff's positions.

Implied-in-fact contracts with the government have been enforced despite statutory or regulatory requirements that contracts be in writing. *Narva Harris Constr. Corp. v. United States*, 216 Ct.Cl. 238, 574 F.2d 508, 510–11 (1978). In *Narva Harris*, the court held that:

The failure, for whatever reason, of an attempt at an express contract be it written or oral, is not enough, in itself, to deprive a party of a recovery for breach where sufficient additional facts exist for the court to infer the "meeting of the minds" necessary to separate an implied-in-fact from a pure implied-in-law contract.

*Narva Harris*, 216 Ct.Cl. at 244, 574 F.2d at 511. To establish the existence of an implied-in-fact contract plaintiff must show:

(1) that there was an unambiguous offer to contract, upon specific terms;

(2) that there was an unambiguous acceptance of that offer;

(3) that both parties intended to enter into a contract, often called mutuality of intent; and

(4) that the United States received consideration.

*City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). Furthermore, when the United States is a party, plaintiff must show that "the officer whose conduct is relied upon had actual authority to bind the government in contract." *Edwards v. United States*, 22 Cl. Ct. 411, 420 (1991) (citing *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985)). Indeed, the burden is on plaintiffs to ascertain the scope of authority of those government officials with whom they deal. In *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the Supreme Court said:

Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Gov-

ernment stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through rule-making power. *Id.* at 384, 68 S.Ct. 1. Stated another way, the United States government may generally deny unauthorized acts of its agents. *Id.*

Plaintiff's complaint alleges that:

Communications between Leonard Murphy and J & K Associates established an express or implied-in-fact contract whereby J & K Associates was to develop a leadership training program for the Concord Station and conduct it for ten or more sessions at a cost of $5,000 per session. J & K Associates developed the course and was ready and able to conduct it. The defendant, through the actions of Murphy, Shaw, and Galway, breached that contract.

Plaintiff contends that it entered into a contract for personnel training services with Murphy. Thus, the primary question in the instant case is whether the negotiations with EDS Murphy established a contract, and if so, did Murphy possess the requisite authority to bind the government in contract.

In support of its motion for summary judgment, defendant has submitted the Declarations of Murphy, Galway, and Shaw, as well as documents pertaining to the negotiations with plaintiff. In opposition, plaintiff has submitted the affidavit of Kenney and various documents pertaining to the negotiations with Murphy and Galway.

### 1. Did Plaintiff's Negotiations with EDS Murphy Create an Implied-In-Fact Contract?

■ Although the parties agree that no one signed an express, written contract, plaintiff still contends that the correspondence between Kenney and Murphy created an implied-in-fact contract. Plaintiff, however, does not point to anything in the record to support its claim. Indeed, the fact that plaintiff concedes that there were subsequent negotiations with Galway indicates that neither party believed that the negotiations with Murphy had culminated in a contract. Murphy, Galway, and Shaw all state in their respective declarations that they never entered into a contract with plaintiff. In particular, Murphy avers that he only discussed the "possibility" of plaintiff providing a training course to supervisory personnel at Concord Station. None of the documents reflecting plaintiff's conversations with Murphy indicate a firm commitment on the Navy's part to purchase plaintiff's training services.

Murphy avers that during his service as an EDS he never represented to any vendor that he was entering into a contract or issuing a DD Form 1556 on behalf of the Navy. Furthermore, during his negotiations with Kenney, Murphy avers that "[a]t no time . . . did I ever state, represent, or imply that we had entered into a 'contract' for training services. To the contrary, each time Ms. Kenney and I spoke, I made it very clear that this matter would have to go to a level above me (*i.e.*, to the Senior Training Board at Concord Station) for final approval."

The documents submitted by plaintiff are not inconsistent with Murphy's averments. At most the letters show that the parties were negotiating over course content, potential dates, and price. Indeed, plaintiff notes in its supplemental brief that its last letter to Murphy, dated September 28, 1992, inquired "whether he desired any changes in the course materials, urg[ed] him to confirm dates for the course, and inform[ed] him of the available dates remaining that year." The September 28 letter also indicates that the location of the course site had not yet been determined. Thus, Murphy clearly had not reached a firm agreement with plaintiff on specific terms, i.e., there was no meeting of the minds.

Consistent with the absence of any expression of unambiguous acceptance by Murphy is the evidence of plaintiff's subsequent negotiations with Galway. Plaintiff's negotiations with Galway are similarly noncommittal. In particular, Cassidy's July 6, 1993 fax to Galway, sent well after Murphy's involvement in the negotiations ended, plainly indicates that no contract had been entered into with Murphy. In her July 6 fax Cassidy states that "until we have a firm contract with your organization, I can't get a contract with [Dr. McKenna]." Hence, plaintiff's own words in-

dicate that it did not believe it had entered a contract with defendant.

Apart from stating that she negotiated with Murphy, there is nothing in Kenney's affidavit averring any particular promises by Murphy leading to the formation of the alleged contract. In sum, the evidence thus far is only that defendant expressed the possibility that a contract could be entered into in the future. Plaintiff has not presented sufficient evidence to create a genuine issue whether the parties created an implied-in-fact contract. Accordingly, the court finds that the negotiations between Murphy, and subsequently with Galway, did not create an implied-in-fact contract.

2. Did Employee Development Specialist Murphy have Authority to Bind the Government in Contract?

█ Defendant argues that neither Murphy nor Galway, as EDSs, had authority to bind the government in contract. Here, too, defendant relies on the declarations of Murphy, Galway, and Shaw as well as pertinent Navy regulations. In opposition, plaintiff contends that EDSs are authorized to bind the government in contract. The court finds that plaintiff has not satisfied its burden of establishing that a genuine issue exists regarding whether EDS Murphy had actual authority to bind the government in contract.

The Federal Circuit recently addressed the issues of implied-in-fact or oral contracts and the requisite authority of government agents to bind the government in contract. In *Harbert/Lummus Agrifuels Projects, et al. v. United States,* 142 F.3d 1429 (Fed.Cir. 1998), the Federal Circuit reversed the decision of the trial court which held that the government entered into an oral, unilateral contract with Harbert/Lummus.[3] The Federal Circuit held that the contracting officer lacked the authority to enter into the oral, unilateral contract. The court stated:

> It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority.

Contractors dealing with the United States must inform themselves of a representative's authority and the limits of that authority. Moreover, "anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority." The burden was on Harbert/Lummus to prove that the CO had the authority to enter into the oral, unilateral contract. The fact that Harbert/Lummus may have believed that the CO had authority is irrelevant; Harbert/Lummus must prove that the CO had actual authority.

*Id.* at 1432. (Citations omitted). In *Harbert* the CO's authority to contract was limited by a provision in his delegation of contracting authority. Because the record contained no evidence that the CO complied with the provision's requirement, the court determined that the CO was not authorized to bind the government.

In the case at bar, Navy Regulation OC-PMINST 12410.1 (Nov. 1, 1988) provides the Navy's policy on acquiring employee training and development. Subchapter 5 of that regulation pertains to training through non-government facilities. One method of acquiring training services under subchapter 5 is by using a DD Form 1556. Section 5–2(g) provides in pertinent part:

> (2) the DD Form 1556 shall be used to obligate funds for an individual event or planned series of the same training event, activity, service or course material that is publicly available, off-the-shelf, does not exceed $25,000 per fiscal year, and requires no more than minor modification to meet DON [Department of the Navy] requirements. The DD Form 1556 may not be used to substitute for formal acquisition procedures or to purchase or contract for any equipment. In the cases where use of the DD 1556 is not authorized, the activity

---

3. The Federal Circuit's decision in *Harbert,* was rendered after the court heard oral argument in this case. The court, by order dated April 22, 1998, directed the parties to file supplemental briefs on or before May 4, 1998, discussing the applicability of *Harbert* to the facts of the instant case. Defendant submitted its brief on May 1, 1998; plaintiff has failed to submit a brief.

contracting officer makes determinations on appropriate procurement procedures for training services, products, courses, etc.

Section 5–3(f) provides in pertinent part:

The authorized activity contracting officer is the only authorized official who can contract for training. Contracting for training is required when a training course or program is not off-the-shelf and requires development or modification at additional cost to the DON to meet a specified training need.

Although not a model of clarity, Navy Regulation OCPMINST 12410.1 vests authority to enter contracts for training services with the Authorized Activity Contracting Officer (AACO) and in certain instances with the Training Officer. Moreover, Shaw, the Training Officer during Murphy and Galway's respective tenures as EDSs, stated in his declaration that he, as the Training Officer, had the authority to issue a DD Form 1556. Whether the authority to enter into contracts rests with the AACO or with the Training Officer depends on whether the contract is (a) "off-the-shelf" and for less than $25,000 per fiscal year, in which case a DD Form 1556 is mandated, and the Training Officer has the authority to sign the DD Form 1556, or (b) not "off-the-shelf" or in excess of $25,000 per fiscal year, in which case a formal written contract is mandated, and the AACO has the authority to sign the contract.

The duties of an EDS, such as Murphy or Galway, did not include obligating funds. In their respective declarations both Murphy and Galway stated that their role as an EDS "was to develop solutions to and plans for the Navy's training needs, and to contact and negotiate with vendors regarding implementation of training programs that met the Navy's training needs." This characterization comports with the job description for an EDS. Further, both averred that under Navy Regulation OCPMINST 12410.1 they possessed no authority to enter into contracts on behalf of the Navy. Moreover, Shaw stated in his Declaration that pursuant to Navy regulations and the policy of Concord Station, neither Murphy nor Galway had authority to issue DD Form 1556 or to enter into contracts with vendors. Thus, Murphy or Galway never had express actual contracting authority.

Kenney states in her affidavit that all her "negotiations, including price, scheduling, and course content are typically conducted with Employee Development Specialists. It is Employee Development Specialists who typically agree to purchase my services." Plaintiff's supplemental brief, however, undermines her claim that it is the EDSs who typically agree to purchase training services by noting that in the instances when a DD Form 1556 has been used to procure training services, someone other than the person with whom Kenney negotiated signed and thereby, authorized the purchase. This, too, is not inconsistent with Murphy's statement that he had no authority to contract and would have to get approval from the Senior Training Board at Concord Station for final approval. Plaintiff has, in essence, conceded that an EDS does not have the requisite authority to purchase training services by issuing a DD Form 1556.

 In the alternative, plaintiff appears to argue that even if Murphy lacked authority to bind the government in contract, his agreement could be ratified through the issuance of a DD Form 1556 signed by someone with authority. Agreements made by government agents without authority to bind the government may be subsequently ratified by those with authority if the ratifying officials have actual or constructive knowledge of the unauthorized acts. *See United States v. Beebe*, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901). Ratification must also be based on a demonstrated acceptance of the contract. *See EWG Assocs., Ltd. v. United States*, 231 Ct.Cl. 1028, 1030 (1982). That never happened in this case. Shaw unequivocally stated that at no time during his tenure as Training Officer did Murphy or Galway ever issue an unauthorized DD Form 1556 and later seek ratification from him. Further, it is undisputed that no DD Form 1556 was issued to plaintiff in this case.

In sum the court finds that summary judgment is appropriate in this case. Based on plaintiff's counsel's statements at oral argu-

ment, the court has before it essentially all the evidence plaintiff expects to offer at trial. In response to defendant's motion for summary judgment, plaintiff, as the opposing party, "must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(f). If plaintiff, the opposing party, presents evidence that is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *see also, Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626–27 (Fed.Cir.1984) (to defeat a motion for summary judgment, "... more is required than mere assertions of counsel."). Here, plaintiff has failed to present sufficient evidence to create a genuine issue about the existence of a contract or that any government agent with whom plaintiff negotiated had the requisite authority to bind the government in contract.

## CONCLUSION

Based on the foregoing discussion, defendant's motion for summary judgment is granted. The clerk is directed to dismiss plaintiff's complaint. No costs.